**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

**SHEILA OBIEFUNA**
7003 Falcon drive
Schererville, IN 46375

*Plaintiff*,

v.

**HYPOTEC, INC.,** *formally known as* **U.V.S. INC.**
11900 Biscayne Blvd., Suite 106
Miami, FL 33181
    <u>Serve on:</u>
    Corporation Service Company
    25 Little Falls Drive
    Wilmington DE  19808

and

**FREDERIC ABITBOL**
9719 Palma Vista Way
Boca Raton, FL 33428

*Defendants*.

Case No. 1:19-cv-1039

---

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Sheila Obiefuna, on behalf of herself and on behalf of the entire class of persons similarly situated, by and through her attorneys, Michael Paul Smith, Melissa L. English and Sarah A. Zadrozny of Smith, Gildea & Schmidt, LLC, Timothy F. Maloney, Veronica B. Nannis and Megan Benevento of Joseph, Greenwald and Laake, P.A., and Gregory Utter and Steven Coffaro of Keating, Muething & Klekamp PLL[1], files this Class Action Complaint, sues the Defendants for cause, claims damages, and states as follows:

---

[1] Motions for *pro hac vice* admission for Attorneys Smith, English, Zadrozny, Maloney, Nannis, Benevento and Utter, pursuant to Local Rule 83-6, are in process.

## INTRODUCTION

1.      Plaintiff Sheila Obiefuna ("Plaintiff Obiefuna") and alleged Class Members are borrowers who currently have or had a residential mortgage loan originated and/or brokered by Defendant Hypotec, Inc. ("Hypotec") formerly known as U.V.S., Inc. ("UVS"), or Allegro Funding Corporation ("Allegro") which was or is secured by Plaintiff's and Class Members' residential real property.

2.      Plaintiff and alleged Class Members are victims of an illegal kickback and price fixing scheme between UVS/Hypotec, and the entity's President Frederic Abitbol ("Abitbol") (collectively, UVS/Hypotec) and All Star Title, Inc. ("All Star"), a Maryland-based title and settlement services company.

3.      Under the scheme, UVS/Hypotec loan officers, agents, and/or other employees, including Abitbol, received and accepted illegal kickbacks in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.* UVS/Hypotec and All Star laundered the kickbacks through third party marketing companies to conceal the illegal kickbacks and the kickback agreement.

4.      As an essential component of the scheme, All Star conspired to and formed a cartel with various residential mortgage lenders ("All Star Lender Cartel"). UVS/Hypotec participated in the All Star Lender Cartel and, in violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1, *et seq.*, entered into naked price fixing, minimum pricing and refusal to deal agreements (collectively, the "Cartel Agreements") with All Star related to the residential mortgage loans generated by All Star's illegal kickback payments to the UVS/Hypotec.

2

5.    UVS/Hypotec benefitted from the Cartel Agreements, because the supracompetitive prices for title and settlement services charged to borrowers on loans brokered or originated by UVS Hypotec under the Cartel Agreements were financed into the borrowers' loans, and which UVS/Hypotec charges and earns interest from these supracompetitive prices.

6.    UVS/Hypotec and All Star continuously and regularly used the U.S. Mail, interstate and international wires in furtherance of the kickback and price fixing scheme, and to identify and defraud borrowers into the All Star Scheme, willfully and intentionally engaging in a pattern of racketeering activity over a period of at least five years, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*

7.    The Kickback and Cartel Agreements, and the resulting supracompetitive prices, were fraudulently concealed by UVS/Hypotec and All Star from Plaintiff and alleged Class Members by: laundering kickbacks through third party marketing companies, creating sham invoice and payment records, fraudulent representations in marketing materials, false allocation of title and settlement fees and manipulation of the APR associated with the UVS/Hypotec loans, and false and fraudulent representations and omissions in borrowers' loan documents, and prevented borrowers, regulators and auditors from discovering the scheme or kickback and Cartel Agreements and the injuries to' borrowers therefrom, thereby allowing the kickbacks and supracompetitive fees to continue.

## PARTIES

8.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 as a class action on her own behalf and on behalf of the entire class of people similarly situated.

9.    Plaintiff Sheila Obiefuna is a resident of Lake County, Indiana.

10.    Defendant Hypotec, Inc., formerly known and registered as U.V.S., Inc., is a Delaware corporation with its headquarters and principal place of business located in Florida, During the time period alleged herein, Hypotec was registered, qualified and doing business in Indiana under the name of U.V.S., Inc. and, after March 21, 2012, the assumed name Hypotec. It is engaged in the business of consumer mortgage brokering, origination and/or lending, and otherwise transacted business in Indiana.

11.    Defendant Frederic Abitbol is a citizen and resident of Palm Beach County, Florida. Abitbol is, and at all relevant times was, the President of Hypotec (and UVS) and engaged in the brokering of residential mortgage loans in Indiana.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), Section 4 of the Sherman Act, 15 U.S.C. § 4, and 18 U.S.C. § 1964(c).

13.    This Court has personal jurisdiction over the parties.   Personal jurisdiction over Defendants is appropriate because during the time period alleged herein UVS/Hypotec, including Abitbol, continuously transacted business within this District and engaged in an illegal price fixing agreement to fix the prices charged by All Star for settlement services that was directed at, and had the intended effect of causing injury to, persons residing in or located in this District.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3), 28 U.S.C. § 1391(d) and 18 U.S.C. § 1965(a).

## FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF

15.    At all relevant times, All Star is a Maryland corporation and a title and settlement service provider licensed in Maryland and more than 30 other states, and provides title and

4

settlement services on residential mortgage loans, refinances and reverse mortgages secured by real property in 47 states.

I.      **The All Star Scheme**

A.      **All Star and Participating Lenders Pay and Receive Kickbacks in Exchange for the Assignment and Referral of Residential Mortgage Loans to All Star and Employ Several Methods to Conceal the Kickbacks.**

16.     Beginning by at least 2008 and continuing, upon information and belief, through at least 2017, All Star designs and executes a scheme ("All Star Scheme") to pay kickbacks to various mortgage lenders and their brokers, loan officers and other employees (collectively, "Participating Lender") pursuant to an agreement and in exchange for the Participating Lender's assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services ("Kickback Agreement").

17.     All Star bases the amount of the kickback All Star paid on the number of loans the Participating Lender assigns and refers to All Star under the Kickback Agreement and the amount of profit All Star realizes on those loans.

18.     All Star pays, and Participating Lenders receive and accept, kickbacks in furtherance of the All Star Scheme in different forms and laundered by and through different channels.

19.     In some instances, All Star pays kickbacks by purchasing and delivering to a Participating Lender marketing materials for the Participating Lender to use in soliciting borrowers, most commonly postage to be used by a Participating Lender to send direct mail solicitations.

20.     In other instances, All Star pays cash kickbacks by checks written directly to a Participating Lender and/or their branch managers, mortgage brokers, loan officers, or other employees.  Often, a Participating Lender or its employee receives and accepts a

kickback check laundered by and through a sham entity set up for the express purpose of receiving and accepting kickbacks and concealing the same.

21.     In most instances, to conceal and launder the kickbacks paid and received under the All Star Scheme, the Participating Lenders and All Star agree to have All Star not issue a check directly to the Participating Lender and/or their branch managers, mortgage brokers, loan officers, or other employees, but instead launders the kickback payment through a third party marketing company.

22.     Participating Lenders and/or their branch managers, mortgage brokers, loan officers, or other employees frequently use third party marketing companies (such as a direct mail, data and/or leads lists, telemarketing or live transfer leads provider) to provide marketing services aimed at soliciting borrowers to obtain residential mortgage loans, refinances and reverse mortgages, which increase the volume of loans the Participating Lender brokers or originates thereby increasing its net profit and commissions earned.

23.     All Star and Participating Lenders use a variety of third party marketing companies to launder the kickbacks. Some of these marketing companies specialize in direct mail, while others specialize in producing data and leads lists of potential borrowers for direct mail or telemarketing solicitations.  Still other third party marketing companies provide Participating Lenders "live transfer" leads in which a borrower who contacts a centralized telemarketing company is transferred "live" to the Participating Lender.

24.     Under the Kickback Agreement, the Participating Lender receiving and accepting the kickback from All Star identifies a third party marketing company that the Participating Lender uses for marketing services.  All Star then makes the kickback payment to the third party marketing company, and the Participating Lender receives and accepts the

kickback payment when the third party marketing company applies the payment to the invoice for marketing services for the benefit of the Participating Lender.

25.     To even further conceal the kickbacks and the Kickback Agreement, All Star and the Participating Lenders request and cause the third party marketing companies to issue sham invoices that falsely identify All Star as the company purchasing and receiving the marketing services.   These sham invoices create the false impression that All Star purchases and receives marketing services when in fact the payment is a kickback received and accepted by the Participating Lender in exchange for the assignment and referral of loans to All Star under the Kickback Agreement.

26.     The sham invoices conceal the fact that any thing of value is exchanged between All Star and the Participating Lender related to the loans that are assigned and referred to All Star under the Kickback Agreement.

27.     In some instances, All Star and the Participating Lender direct the third party marketing company to issue sham "split" invoices to both All Star and the Participating Lender for a portion of the amount due to the third party marketing company.

28.     All Star and the Participating Lenders' choice to use the split invoices create the false impression that All Star purchased and received marketing services when in fact the payment is a kickback received and accepted by the Participating Lender in exchange for the assignment and referral of loans to All Star under the Kickback Agreement.   The sham split invoices also hide All Star and the Participating Lender's coordinated business relationship because there is no Participating Lender listed on the sham split invoice received and paid by All Star.

29.     In other instances, All Star and the Participating Lenders choose to conceal the kickback payment entirely by creating sham payment records. To do this, a Participating Lender

7

directs All Star to launder a kickback through the third party marketing company without the use or issuance of any invoice. Other times, the Participating Lender forwards to All Star an invoice addressed to the Participating Lender and All Star launder a kickback through a third party marketing company by simply referencing the Participating Lender's invoice number.

30. All Star and Participating Lenders choose to use sham invoice and payment records to conceal the fact that any kickback payment is made by All Star as well as the fact that All Star and the Participating Lender exchanged a thing of value related to the loans assigned and referred to All Star under the Kickback Agreement.

**B.  All Star and Participating Lenders Form a Cartel and Conspire and Agree to Fix and Charge Borrowers Higher Prices for Title and Settlement Services and Refuse to Deal with Competitors.**

31. One of the purposes of the All Star Scheme is to allow All Star to charge borrowers higher prices for title and settlement service than is possible in a competitive market and to exclude other title and settlement services from the market for title and settlement services on residential mortgage loans, refinances and reverse mortgages.

32. To achieve these purposes, All Star and Participating Lenders conspire to and form a cartel ("All Star Lender Cartel"), enter agreements and act in restraint of trade.

33. To enforce the All Star Lender Cartel, All Star and Participating Lenders conspire and agree to fix the prices All Star charges the Participating Lender's borrowers for title and settlement services on loans that are assigned and referred to All Star under the Kickback Agreement ("Price Fixing Agreement").

34. In addition, All Star and the Participating Lenders conspire and agree to minimum prices to charge borrowers for title and settlement services on loans that are assigned and referred to All Star under the Kickback Agreement ("Minimum Fee Agreements").

35.     The Price Fixing and Minimum Fee Agreements are enforced by an agreement that the Participating Lender refuse to deal with any other title and settlement services company on those loans generated by the kickbacks ("Refusal to Deal Agreement") (collectively, with the Price Fixing and Minimum Fee Agreements, the "Cartel Agreements"), such that all loans generated by the Kickback Agreement are referred to All Star and are subject to the Price Fixing and Minimum Fee Agreements.

36.     The prices All Star and the Participating Lenders fix under the Price Fixing and Minimum Fee Agreements are supracompetitive and higher than the prices that borrowers would otherwise be charged for title and settlement services in a competitive market and without the Cartel Agreements.

37.     An additional purpose of the All Star Lender Cartel formed by All Star and Participating Lenders under the Kickback and Cartel Agreements is to exclude All Star's competitors from the market for title and settlement services on residential mortgage loans, refinances and reverse mortgages, and to deprive borrowers of their choice of title and settlement service provider on loans generated by the All Star-funded kickbacks.

38.     Participating Lenders benefit from the Cartel Agreements and the All Star Scheme because: (i) the supracompetitive pricing funds the illegal kickbacks used by Participating Lenders to solicit borrowers, generate residential mortgage loans, and earn substantial interest and commissions, and (ii) the costs for title and settlement service fees are financed into the loan and paid for by borrowers from loan proceeds such that the Participating Lender earned interest and other fees from the supracompetitive pricing.

**C.** **All Star and the Participating Lenders Use the U. S. Mail and Interstate Wires to Identify and Lure Borrowers into the All Star Scheme.**

39.     All Star and Participating Lenders engage in the All Star Scheme to defraud borrowers into paying supracompetitive prices for title and settlement services, thereby funding and continuing the kickbacks All Star is paying Participating Lenders.

40.     In addition, All Star and Participating Lenders intend the All Star Scheme to deprive borrowers of the intangible right of the Participating Lenders' honest services by using the kickbacks to solicit borrowers, generate residential mortgage loans, and earn substantial interest and commissions.

41.     In service of these intentions, Participating Lenders and All Star use the kickback payments to lure borrowers into the All Star Scheme by using interstate mail and wires to identify, solicit and lure borrowers into the All Star Scheme.

42.     Potential borrowers are identified by the third party marketing companies through which All Star and Participating Lenders are laundering the kickbacks.  Many of these third party marketing companies specialize in identifying and soliciting potential borrowers, and compiling and selling borrower sales and marketing "leads lists."

43.     Participating Lenders use these lists to solicit borrowers often through printed direct mail pieces such as postcards, letters, "SNAP packs" (mailers with perforated edges the recipient rips or "snaps" open), and other printed material that encourage borrowers to contact the Participating Lender and apply for a residential mortgage loan, refinance or reverse mortgage.

44.     All Star requires, and Participating Lenders agree, to include false representations in the Participating Lender's direct mail borrower solicitations, stating that a potential borrower would save "30-40% on title fees" by using All Star.  The purpose of these false

representations is to: (i) prevent a borrower from trying to use a different title and settlement services company for the loan, (ii) conceal the fixed, supracompetitive pricing resulting from the All Star Scheme, and (iii) create the false representation that the prices charged the borrower for title and settlement services would be lower than the prices charged by All Star competitors.

45. Participating Lenders and All Star, by and through third party marketing companies, cause borrower data and leads list to be merged onto these direct mail solicitations, and Participating Lenders, by and through the third party marketing companies, cause these fraudulent solicitations to be sent through the interstate U.S. mail.

46. All Star and Participating Lenders also obtain from third party marketing companies borrower data and leads list to solicit borrowers over the telephone, and Participating Lenders use interstate wires to make these telemarketing calls to potential borrowers. Plaintiff believes, and therefore avers, that All Star requires, and Participating Lenders agree, to make false representations to borrowers in these telephone solicitations similar to the false representations that All Star and Participating Lenders agree to include in direct mail solicitations.

47. Participating Lenders also receive "live transfer" leads wherein a borrower calls a centralized call center, and then is transferred by the call center "live" to the Participating Lender. The third marketing company delivering the live transfer leads transmits the "live transfer" over interstate wires, and the Participating Lender receives the live transfer calls over interstate wires.

48. All Star's records document that these borrower solicitation techniques lured thousands of borrowers into the All Star Scheme.

49.     The activities of the All Star Scheme affect interstate commerce across more than 30 states.

## II.     UVS/Hypotec Participation in the All Star Scheme Begins by April 2010

50.     Abitbol incorporates Hypotec in Delaware in February, 2004 under the name "U.V.S. Inc."  UVS registers and is authorized to conduct business in Indiana by October, 2010. Abitbol is identified as President of UVS in both its original incorporation papers and its Indiana registration application.

51.     Although incorporated as UVS, the entity and its employees and/or agents, including Abitbol, conducts business under the assumed name of Hypotec Lending beginning by at least 2010. In September, 2012, Indiana grants UVS' application permitting it to conduct business under the assumed name of Hypotec. In January 2015, UVS files an amendment to its corporate entity filing, formally changing its name to "Hypotec Inc." In all of these applications, Abitbol is identified as President of UVS/Hypotec.

### A.     UVS/Hypotec and Abitbol Begin Participating in the All Star Scheme by Assigning and Referring Allegro loans to All Star in Exchange for Tens of Thousands in Kickbacks.

52.     By April 2010, Abitbol, in the course and scope of his employment and/or agency with UVS, is brokering loans under UVS' assumed name of Hypotec. The loans UVS/Hypotec is brokering by and through Abitbol are funded by Allegro Funding Corporation.  Abitbol identifies Allegro's business office as located at 6381 Hollywood Boulevard, Suite 601-B, Los Angeles, CA 90028, the same address Abitbol reports as UVS's principal place of business.

53.     In April 2010, All Star begins paying kickbacks to UVS/Hypotec and Abitbol in exchange for the assignment and referral of Allegro loans, refinances and reverse mortgages to All Star for title and settlement services.  UVS/Hypotec, Abitbol and All

Star choose to launder the kickback payments through Titan List and Mailing Services ("Titan"), a Florida based marketing services company.

54.     By December 2010, All Star and UVS/Hypotec, by and through Abitbol, have formalized their Kickback Agreement with All Star splitting and kicking back to UVS/Hypotec $350 for each loan UVS/Hypotec and/or Abitbol assigns and refers to All Star under the Kickback Agreement. **Exhibit 1,** Dec. 12 - 16, 2010 email correspondence.  To help conceal the illegal Kickback Agreement from borrowers, regulators and auditors, UVS/Hypotec, Abitbol, and All Star choose and agree to launder the kickback payments through marketing companies to conceal the kickbacks and create the false impression the kickbacks are payments for legitimate services.

55.     Between April, 2010, and March, 2011, All Star pays $77,996.23 in kickbacks to UVS/Hypotec and Abitbol laundered through Titan. At a minimum, All Star pays UVS/Hypotec and Abitbol kickbacks on a monthly basis, and, more often than not, makes multiple kickback payments in a single month that are received and accepted by UVS/Hypotec and/or Abitbol. The sham split invoices and payment records associated with these kickbacks are collectively attached as **Exhibit 2**.

56.     The sham invoices associated with these twenty three kickback payments state that Titan produces, prints and mails borrower solicitations on behalf of Fred Abitbol at "Freda@hypoteclending.com". *See, e.g.,* **Exhibit 2(a)**.  Plaintiff believes and therefore avers that Fred Abitbol receives and accepts the kickback payments in the course and scope of his employment and/or agency on behalf of UVS/Hypotec.

57.     The sham invoices associated with these kickback payments state that UVS/Hypotec and Abitbol use the kickback payments to cause solicitations to be produced and mailed

interstate an attempt to lure tens of thousands of borrowers into the All Star Scheme and for the purpose of continuing to receive kickbacks from All Star.

58.    Based on the postage charges appearing on the sham invoices, Plaintiff believes, and therefore avers, that UVS/Hypotec causes these borrower solicitations to be placed in the U.S. Mail with most, if not all, delivered interstate; that is, the borrower solicitations are placed in the mail in one state and delivered to potential borrowers in other states.

59.    Each of the twenty three kickback payments in **Exhibit 2** is made by transmission over and using interstate wires. In some instances, All Star electronically transmits a credit card authorization form from its office in Maryland and UVS/Hypotec and/or Abitbol receives the kickback payment by and through Titan in Florida. In other instances, All Star sends the kickback payment by wire with the payment originating at All Star's bank in Maryland, and being received by UVS/Hypotec and Abitbol through Titan in Florida.

60.    During this first year of participation in the All Star Scheme, UVS/Hypotec, by and through Abitbol and other loan offices, employees and /or agents, assigns and refers more than 230 Allegro loans to All Star for title and settlement services in performance of the Kickback and Cartel Agreements and involving loan transactions secured by real property in more than 15 states, including Indiana.

    **B.    UVS/Hypotec and Abitbol Continue Participation in the All Star Scheme Receiving More Than a Half of a Million Dollars in Kickbacks Over the Next Two Years.**

61.    On or about May 2011, UVS/Hypotec and Abitbol discontinue brokering Allegro-funded loans but UVS/Hypotec and Abitbol continue to perform the Kickback and Cartel Agreements substituting UVS originated loans brokered through UVS/Hypotec by Abitbol and other UVS/Hypotec employees and/or agents. *See* May 16, 2011 email correspondence, attached as **Exhibit 3**.

62. All Star continues to perform the Kickback Agreement and continues to pay UVS/Hypotec kickbacks laundered through Titan.

63. At the beginning of this phase of participation in the All Star Scheme, All Star and UVS/Hypotec agree to drastically increase the kickback All Star pays UVS/Hypotec. All Star agrees to split and kick back $1,800 to UVS on each loan assigned and referred to All Star by UVS/Hypotec. *See* April 8-11, 2011 email correspondence, collectively attached as **Exhibit 4.**

64. For the two years spanning May, 2011, through April, 2013, All Star pays $529,250.29 in kickbacks to UVS/Hypotec laundered through Titan. The sham and split invoices and payment records associated with these kickbacks are collectively attached as **Exhibit 5**.

65. The sham invoices associated with these kickback payments state that UVS/Hypotec and Abitbol use the kickback payments to cause solicitations to be produced and mailed in an attempt to lure tens of thousands of additional borrowers into the All Star Scheme.

66. Based on the postage charges on the sham invoices, Plaintiff believes, and therefore avers, that UVS/Hypotec causes these borrower solicitations to be placed in the U.S. Mail with most, if not all, delivered interstate; that is, the borrower solicitations are placed in the mail in one state and delivered to the potential borrowers in other states.

67. Again, all of the kickback payments described above were paid by All Star, and received and accepted by UVS/Hypotec and/or Abitbol, using and over interstate wires. In those instances when All Star paid the kickback by wire transfer, the payment was transmitted over interstate wires originating at All Star's bank in Maryland with UVS/Hypotec and/or Abitbol receiving and accepting the kickback by and through Titan in Florida. *See, e.g.,* **Exhibit 5 (k).** In those instances when All Star paid the kickback by credit card, All Star transmitted the credit card authorization over the interstate wires from its offices in

Maryland with the authorization and kickback received and accepted by UVS/Hypotec and/or Abitbol by and through Titan in Florida. *See, e.g.,* **Exhibit 5 (a)**

68.     Also during this time period, All Star pays kickbacks to UVS/Hypotec laundered through Aziza Marketing, Inc ("Aziza"), a Florida-based internet marketing company.  See July 5, 2011 e-mail from UVS to All Star forwarding invoice for payment, attached as **Exhibit 6**.

69.     All Star pays $29,911.22 in kickbacks to UVS laundered through Aziza. The sham invoices and payment records are collectively attached as **Exhibit 7**.

70.     All of the kickback payments laundered through Aziza were paid by All Star, and received and accepted by UVS/Hypotec and/or Abitbol, using and over interstate wires via wire transfer, originating at All Star's bank in Maryland and UVS/Hypotec and/or Abitbol receiving and accepting the kickback by and through Aziza in Florida. *See, e.g.,* **Exhibit 7 (c).**

71.     In addition to Titan and Aziza, beginning on or about May 13, 2013, All Star begins paying kickback to UVS laundered through GuateCall, a Guatemala City-based call center ("GuateCall").  From May, 2013, through October, 2014, All Star pays $228,290 in kickbacks to UVS/Hypotec laundered through GuateCall. The sham invoices and payment records are collectively attached as **Exhibit 8.**

72.     According to invoices and payment records collected in Exhibit 8, UVS is receiving "live transfer" calls from GuateCall, where potential borrowers contact a centralized call center and then are transferred by GuateCall to UVS/Hypotec brokers and other employees.  *See also,* call activity spreadsheet for 10/28/13-11/3/13, attached as **Exhibit 9**.  The call center GuateCall uses to receive and transmit these calls is not in the United States, and the calls are transmitted over and using interstate and international wires, with the call

originating in one state, transferred internationally to Guatemala, and then transferred again to UVS's loan officers in a second state.

73.   All of the kickback payments laundered through GuateCall are made using and by transmission over interstate wires, with All Star transmitting the kickback payment from its bank in Maryland and received and accepted by UVS/Hypotec by and through GuateCall's U.S. parent company, Saika, S.A., in New York. *See, e.g.,* **Exhibit 8 (b)**.

74.   From May, 2011, through August, 2013, UVS/Hypotec assigns and refers more than 700 UVS loans to All Star for title and settlement services in performance of the Kickback and Cartel Agreements and involving loan transactions secured by real property in more than 10 states, including Indiana.

   **C.    UVS/Hypotec and Abitbol Continue Participation in the All Star Scheme Receiving Tens of Thousands of Dollars More in Kickbacks for the Assignment and Referral of Hypotec Brokered Loans.**

75.   By October 2014, UVS/Hypotec and Abitbol begin to operate and hold themselves out to the public as Hypotec and less frequently as UVS. *See* Oct. 27, 2014 e-mail from Danny Perez, attached as **Exhibit 10.**  Hypotec maintains branch locations at 11900 Biscayne Blvd., Suite 106, Miami FL and at 6380 Wilshire Blvd., Suite 1602, Los Angeles, CA.

76.   UVS/Hypotec and Abitbol continue to perform the Kickback and Cartel Agreements receiving and accepting kickbacks in exchange for referring and assigning Hypotec loans to All Star for title and settlement services.

77.   All Star continues paying kickbacks to UVS/Hypotec.  In December, 2014, All Star and UVS/Hypotec agree that All Star will split and kickback to UVS/Hypotec $700 for every loan referred and assigned to All Star by UVS/Hypotec. **Exhibit 11,** December, 5, 2014 email correspondence.

78.   Between November, 2014, and May, 2015, All Star pays $46,246.00 in kickbacks to UVS/Hypotec laundered through GuateCall.  The sham invoices and payment records associated with these kickbacks are attached as **Exhibit 12.**

79.   UVS/Hypotec is receiving "live transfer" calls from GuateCall, and the calls are being directed to UV/Hypotec and its loan officers and other employees and/or agents.  *See, e.g.*, **Exhibit 9**.  The call center GuateCall uses to receive calls from potential borrowers and transmit the calls to UVS/Hypotec is not in the United States, and the calls are transmitted over interstate and international wires, with the call originating in one state, transferred internationally to Guatemala, and then transferred again to UVS/Hypotec's loan officers in a second state.

80.   All of the kickback payments attached as **Exhibit 12** are made by transmission over interstate wires, with All Star transmitting the kickback payment by wire transfer originating at All Star's bank in Maryland and received and accepted by UVS/Hypotec, by and through GuateCall's U.S. parent company, Saika, S.A., in New York.  *See, e.g.,* **Exhibit 12 (a)**.

81.   UVS/Hypotec and All Star agree to and perform the Kickback Agreement through at least September 2015, with UVS/Hypotec, Abitbol and All Star continuing to launder kickbacks through Titan and other third party marketing companies. *See* Aug. 31–Sept. 8, 2015 e-mail communications between Abitbol and Titan regarding All Star payment of invoice and scheduling of mail drop, attached as **Exhibit 13**. Based on the continuing pattern of practice between UVS/Hypotec, Abitbol and All Star, Plaintiffs believe and therefore aver UVS/Hypotec, Abitbol and All Star continue to perform the Kickback and Cartel Agreements through at least December, 2015, and, on information and belief, longer.

82.   UVS/Hypotec, by and through Abitbol and others, assigned and referred more than 150 Hypotec loans to All Star for title and settlement services in performance of the Kickback and Cartel Agreements and involving loan transactions secured by real property in more than 5 states, including Indiana.

83.   Based on the continuing pattern of practice between All Star, UVS/Hypotec and Abitbol, Plaintiff believes, and therefore avers, that All Star pays, and UVS/Hypotec receives and accepts, kickbacks in exchange for the assignment and referral of Allegro, UVS and/or Hypotec loans from additional known and unknown UVS/Hypotec loan officers, brokers and/or other employees and/or agents in furtherance and performance of the Kickback Agreement, including, but not limited to Pejman Gabayan, Lawrence Abitbol, Justin McKenzie, Patric Keating, Greg Thompson, Marcus Decarie, Phil Pion, Brandon Smith, Sebastian Prosper, Valerie Hapner, and Richard Khalifa.   *See* **Exhibit 9,** listing UVS/Hypotec loan officers, employees and/or agents receiving live transfer calls from GuateCall.

84.   Based on the continuing pattern of practice between All Star, UVS/Hypotec and Abitbol, Plaintiff believes, and therefore avers, that All Star pays kickbacks to UVS/Hypotec and Abitbol by and through other third party marketing companies in addition to those identified herein.

85.   Based on the continuing pattern of practice between All Star, UVS/Hypotec and Abitbol, Plaintiff believes, and therefore avers, that All Star, UVS/Hypotec and Abitbol use and cause to be used U.S. mail and/or interstate wires to identify and solicit borrowers that are the currency of the Kickback and Cartel Agreements between All Star, UVS/Hypotec, and Abitbol.

86.     No title services are provided by UVS/Hypotec, or by their employees and/or agents, including Abitbol, associated with the receipt and acceptance of the kickbacks. The payment by All Star and the receipt and acceptance by UVS/Hypotec and Abitbol of the kickbacks is made solely for the assignment and referral of the UVS/Hypotec borrowers to All Star.

87.     At all relevant times, Abitbol and all other UVS/Hypotec loan officers, employees and/or agents who receive and accept kickbacks are licensed mortgage brokers and/or authorized loan officers, and at all relevant times are acting within scope of the business relationship and duties of their employment on behalf of UVS/Hypotec, specifically seeking borrowers and originating and securing loans for residential mortgages through UVS/Hypotec and/or brokering such loans through UVS/Hypotec to other lenders whom UVS/Hypotec authorizes, referring the borrowers to title companies, and working with title companies to close these loans. All activities, including interactions with All Star, are for the benefit of UVS/ Hypotec and/or Abitbol.

**D.      UVS/Hypotec and Abitbol Perform the Cartel Agreements Fixing Supracompetitive Prices for Title and Settlement Services and Refusing to Deal with Competing Title Companies.**

88.     Beginning in July 2010, All Star and UVS/Hypotec, by and through Abitbol, conspire and agree to fix prices for title and settlement services associated with Allegro loans assigned and referred by Abitbol and UVS/Hypotec to All Star under the Kickback Agreement. Initially, UVS/Hypotec, by and through Abitbol, and All Star agree to fix prices at $600 plus title in licensed states, and $1,300 (including title) for loans closed in Florida. All Star and UVS/Hypotec further agree to charge $200 more in unlicensed states; that is, those states in which All Star is not a licensed title and settlement services company and must work with a cooperating title company. *See* July 7, 2010 Title Fees

Spreadsheet, attached as **Exhibit 14**. This $200 Unlicensed State Surcharge is the minimum amount of actual damages sustained by borrowers from unlicensed states assigned and referred to All Star by UVS/Hypotec in performance of the Cartel Agreements during this time period.

89.    The next month, in August, 2010, All Star and Abitbol discuss the Kickback and Refusal to Deal Agreements, wherein Abitbol demands All Star to continue paying kickbacks to Abitbol and UVS/Hypotec based on Abitbol' s performance of the Cartel Agreements: "You already did not contribute the whole month of July and now you are not contributing for 3 out of 4 weeks in august.  I cannot continue to send all my business unless I know you will start again on our original deal." *See* Aug. 16, 2010 e-mail, attached as **Exhibit 15**

90.    Two months later, in October, 2010, after several months and thousands of dollars of kickback payments, All Star and UVS/Hypotec, by and through Abitbol, expand their pricing fixing agreement. While continuing to apply a fixed $600 plus title for loans closed in licensed states and $800 plus title for loans closed in unlicensed states, All Star and UVS/Hypotec, by and through Abitbol agree and fix prices for FHA Streamline loans to $600 plus title in licensed states and $800 plus title in unlicensed states.  *See* Oct. 25, 2010 Fee Spreadsheet, attached as **Exhibit 16**.  These prices are approximately $100 higher than the prices All Star is charging other Participating Lenders (UVS/Hypotec Overcharge"), which amount represents the minimum amount of actual damages incurred by borrowers assigned and referred to All Star by UVS/Hypotec, through Abitbol and other employees and/or agents, pursuant to the Cartel Agreements.

91.    Just two months later, in December, 2010, UVS/Hypotec, by and through Abitbol, and All Star conspire and agree to fix prices even higher, increasing the amount charged in

licensed and non-licensed states to $800 plus title insurance, and in Florida to $1,500 including title. This agreement is memorialized in the 12/16/10 Title Fee Spreadsheet, attached as **Exhibit 17**.  These prices are approximately $100-$300 higher than the prices All Star is charging other Participating Lenders and this UVS/Hypotec Overcharge, along with any applicable Unlicensed State Surcharge, represents the minimum amount of actual damages incurred by borrowers assigned and referred to All Star by  UVS/Hypotec pursuant to the Cartel Agreements.

92.   The December, 2010, agreement also memorializes that $350 of the $800 charged is the amount All Star splits and kicks back to UVS/Hypotec and is not associated with any legitimate title or settlement service. *See* **Exhibit 1.** .  In addition and in the alternative to the UVS/Hypotec Overcharge and any applicable Unlicensed State Surcharge, this $350 Kickback Surcharge represents the minimum amount of actual damages incurred by borrowers assigned and referred to All Star by UVS/Hypotec pursuant to the Cartel Agreements during this time period.

93.   Four months later, in April, 2011, All Star and UVS/Hypotec, by and through Abitbol, conspire and agree to triple the fixed prices for title and settlements services on those loans assigned and referred to All Star by UVS/Hypotec to $2,350 plus title insurance. These prices are approximately $300-$1,650 higher than the prices All Star is charging other Participating Lenders, which amount of UVS/Hypotec Overcharge represents the minimum amount of actual damages incurred by borrowers assigned and referred to All Star by UVS/Hypotec pursuant to the Cartel Agreements.

94.   Under these new fixed prices, All Star and UVS raise the Kickback Surcharge six fold with All Star splitting and kicking back to UVS/Hypotec $1,800 of the fixed price for each loan assigned and referred to All Star under the Kickback and Cartel Agreements.

In addition to and in the alternative to the UVS/Hypotec Overcharge, this $1,800 Kickback Surcharge constitutes the minimum amount of actual damages incurred by borrowers assigned and referred to All Star by UVS/Hypotec pursuant to the Cartel Agreements. *See* **Exhibit 4.**

95. To replace revenue that it is splitting and kicking back to UVS./Hypotec, All Star instructs its employees to charge UVS/Hypotec borrowers for unnecessary endorsements and enhanced title policies on loans assigned and referred by UVS/Hypotec to All Star under the Kickback and Cartel Agreements. The amounts associated with these unnecessary endorsements and enhanced title policies constitutes an Enhanced Title Surcharge, which amount along with the other amounts pled herein, constitute the minimum amount of actual damages suffered by UVS borrowers assigned and referred to All Star by UVS pursuant to the Cartel Agreements.  See Aug. 12 to Aug. 26, 2011 e-mail correspondence regarding use of "enhanced policies", attached as **Exhibit 18**.

96. A few weeks after instituting the policy of charging unnecessary endorsement and enhanced title policies, Alex Godobrodko, a sales representative employed by All Star, circulates a spreadsheet memorializing the price fixing and minimum fee agreements with certain Participating Lenders in the All Star Scheme. Based on the facts pled herein, Plaintiff believes and therefore avers that the agreements attributed to "Allegro Funding" are the price fixing and minimum fee agreements between All Star and UVS/Hypotec and are applied to all loans referred to All Star by UVS/Hypotec and/or its employees and/or agents, including Abitbol. *See* 9/16/11 Fee Spreadsheet, attached as **Exhibit 19**.

97. Under these price fixing and minimum fee agreements, UVS/Hypotec' borrowers are charged $2,350 plus title for loans closed in licensed states. These prices are approximately $300-$1,650 higher than the prices All Star is charging other Participating

Lenders, which UVS/Hypotec Overcharge represents the minimum amount of actual damages incurred by borrowers assigned and referred to All Star by UVS/Hypotec pursuant to the Cartel Agreements during this time period.

98.     Under these price fixing and minimum fee agreements, UVS borrowers from unlicensed states are charged $1,000 plus title, representing a $200 increase in the Unlicensed State Surcharge. In addition and in the alternative to the UVS/Hypotec Overcharge and/or Kickback Surcharge, this Unlicensed State Surcharge is the minimum amount of damages incurred by borrowers in "unlicensed states" assigned and referred to All Star by UVS/Hypotec under the Kickback and Cartel Agreements during this time period.

99.     Four months later, on January 12, 2012, All Star and UVS/Hypotec agree to modify its price fixing agreement to charge $2,350 plus title insurance on loans assigned and referred by UVS/Hypotec to All Star from "All States except NM", and to charge $1,000 plus title insurance on loans assigned and referred to All Star located in New Mexico. *See* 1/12/12 Fee Spreadsheet, attached as **Exhibit 20**.  These prices are approximately $800-1,550 higher than the prices All Star is charging other Participating Lenders, a UVS/Hypotec Overcharge which represents the minimum amount of actual damages incurred by borrowers assigned and referred to All Star by UVS/Hypotec pursuant to the Kickback and Cartel Agreements during this time period.

100.    In December 2014, All Star and UVS/Hypotec conspire and agree to fix prices for title and settlement service associated with Hypotec loans assigned and referred from UVS/Hypotec to $1,150 plus title insurance.  Of this amount, $700 represents the amount All Star splits and kickbacks to UVS/Hypotec for assigning and referring the loan to All Star for title and settlement services. In addition and in the alternative to the UVS/Hypotec Overcharge, this Kickback Surcharge is the minimum amount of damages

incurred by borrowers referred and assigned to All Star by UVS/Hypotec under the Kickback and Cartel Agreements during this time period. *See* **Exhibit 11.**

101. Approximately four months later, in April, 2015, All Star and Hypotec conspire and agree to fix prices for title and settlement service associated with loans assigned and referred from UVS/Hypotec to $750 plus title insurance in licensed states, and $1,000 plus title insurance for loans assigned and referred to All Star in commitment states, that is, states requiring borrowers obtain a letter certifying that their loan has been through the underwriting process and has been approved.  *See* April 29, 2015 e-mail, attached as **Exhibit 21.**  These prices are approximately $55-$255 higher than the prices All Star is charging other Participating Lenders, a UVS/Hypotec Overcharge which represents the minimum amount of actual damages incurred by borrowers assigned and referred to All Star by UVS/Hypotec pursuant to the Cartel Agreements during this time period.

102. All Star and UVS/Hypotec perform the Cartel Agreements, including these fixed and minimum price agreements, for loans assigned and referred to All Star by UVS/Hypotec through at least November, 2015, and, based on All Star and UVS/Hypotec's continuing pattern of practice, longer.   *See* June 29, 2015 e-mail, attached as **Exhibit 22;** Jason's Client Fee Structure Effective 11/30/15, attached as **Exhibit 23**.

103. Based on the continuing pattern of practice between All Star and UVS/Hypotec, Plaintiff believes, and therefore avers, that All Star and UVS/Hypotec conspire to and fix prices for title and settlement services associated with loans assigned and referred to All Star by additional known and unknown UVS/Hypotec loan officers, employees and/or agents in furtherance and performance of the All Star Lender Cartel and the Cartel Agreements.

104. UVS/Hypotec and Abitbol exercise a managerial role in the All Star Scheme by receiving and accepting the kickback payments, requiring performance of Kickback and Cartel

Agreements, and agreeing and requiring that All Star charge supracompetitive prices for title and settlement services to execute and allow the All Star Scheme to continue.

105.   As a result of the Kickback and Cartel Agreements, and UVS/Hypotec's and Abitbol's participation in the All Star Lender Cartel and wider All Star Scheme, the borrowers on loans assigned and referred to All Star by UVS/Hypotec, including Plaintiff and alleged Class Members, are harmed because they are defrauded into being charged and paying higher and supracompetitive prices for title and settlement services than they would have been charged and paid without the Kickback and Cartel Agreements, are denied kickback free title and settlement services, are denied their choice of title and settlement service provider and other consumer benefits of a competitive marketplace, and are deprived of the intangible right to honest services by their mortgage broker.

## FACTUAL ALLEGATIONS RELATED TO
## THE INDIVIDUAL CLASS REPRESENTATIVE

106.   Plaintiff's transaction and the course of events thereafter exemplify the working of the Kickback and Cartel Agreements and are typical of all alleged Class Members' transactions.

107.   In or about October 2015, Plaintiff Sheila Obiefuna obtains a residential mortgage loan from UVS/Hypotec through Abitbol, the President of Hypotec, in relation to the refinance of her residential real property located at 7003 Falcon Drive, Shererville, IN 46375. Plaintiff Obiefuna's UVS/Hypotec loan closes on or about October 16, 2015.

108.   Plaintiff Obiefuna believes, and therefore avers, that Abitbol assigned and referred Plaintiff Obiefuna's loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the kickback All Star paid to Hypotec in accordance with ¶ 81, thereby performing the Kickback and Cartel Agreements, depriving Plaintiff Obiefuna of

26

her choice of title and settlement service provider, and denying Plaintiff Obiefuna kickback-free title and settlement services.

109. All Star charges Plaintiff Obiefuna for title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements. When All Star initially sends Obiefuna's HUD-1 to UVS/Hypotec for approval, see **Exhibit 30**, UVS/Hypotec directs All Star to raise the fees it is charging Obiefuna to match the Price Fixing Agreement. **Exhibit 31**, Oct. 15, 2015 email directing All Star to increase fees.  All Star does so. **Exhibit 32,** Obiefuna HUD-1.

110. Plaintiff Obiefuna believes, and therefore avers, the price for title and settlement service fees All Star charges to Plaintiff Obiefuna are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements.

111. The title and settlement service fees UVS/Hypotec and All Star charges Obiefuna, and Obiefuna pays,  include the approximately $55-255 UVS/Hypotec Overcharge described in ¶101, which is the minimum amount of Plaintiff Obiefuna's actual damages resulting from the All Star Scheme and Cartel Agreements.

112. Plaintiff Obiefuna believes, and therefore avers, that All Star disburses proceeds from Plaintiff Obiefuna's UVS/Hypotec loan in payment of these title and settlement service charges.

113. As a direct and proximate result of the Kickback and Cartel Agreements, and UVS/Hypotec's performance of these agreements, Plaintiff Obiefuna is harmed because she was: (i) charged and paid more for settlement services than she would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of her choice of title and settlement service provider and her mortgage broker's

impartial evaluation of All Star's service and quality; (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers; and (v) deprived of her right to honest services of her mortgage broker.

114.    As a direct and proximate result of the Kickback and Cartel Agreements, Plaintiff Obiefuna was charged and paid more for the title and settlement services than she would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least approximately $55-255 and, on information and belief, additional amounts.

## FACTUAL ALLEGATIONS RELATED TO LIMITATIONS

115.    Essential to the All Star Scheme, UVS/Hypotec and Abitbol, as well as other members of the All Star Lender Cartel, and All Star undertake affirmative acts that fraudulently conceal the Kickback and Cartel Agreements, the resulting kickbacks and fixed prices, and the actual injury and damages to borrowers, including Plaintiff and alleged Class Members.

I.    **All Star and UVS/Hypotec Launder Kickbacks through Third Party Marketing Companies and Use Sham Invoice and Payment Records.**

116.    As described in ¶ 21 above, UVS/Hypotec, Abitbol and All Star chose to conceal the fact and payment of kickbacks by laundering kickbacks through third party marketing companies.

117.    As described in ¶¶ 24-29, UVS/Hypotec and All Star further chose to conceal the illegal kickbacks and Kickback Agreement through the creation of sham invoices and sham payment records.

118. These sham invoices and payment records create an ongoing false record that conceals and prevents discovery of the fact that any thing of value is exchanged between UVS/Hypotec and All Star related to the assignment and referral of UVS/Hypotec loans, including Plaintiff's loan, the actual payment and receipt and acceptance of illegal kickbacks, and UVS/Hypotec's coordinated business relationship with All Star.

## II.    Abitbol, UVS/Hypotec and All Star's Fraudulent Marketing Representations

119. To further conceal the Price Fixing, Minimum Fee Agreements, the Kickback Agreement, and the resulting supracompetitive prices charged to borrowers for title and settlement services, Abitbol, UVS/Hypotec and All Star make false representations to borrowers in marketing materials.

120. In direct mail solicitations of borrowers, UVS/Hypotec represents that a borrower can receive "30-40% off when using All Star Title!" and that All Star is UVS/Hypotec's "Preferred Title Company" *See, e.g.*, April 14, 2010 Allegro mailer, attached as **Exhibit 24**, and Sept. 21, 2011 and June 28, 2013 UVS mailers, collectively attached as **Exhibit 25**.

121. These representations are false because: (i) neither UVS/Hypotec nor its loan funding affiliates recognize the designation of a "preferred" title company; (ii) a borrower cannot save any percentage of title fees with All Star, but instead is charged higher and supracompetitive fees under the Price Fixing and Minimum Fee Agreements; (iii) the reason the UVS/Hypotec broker wants a borrower to use All Star is for UVS/Hypotec to obtain kickbacks and to perform its obligations under the Cartel Agreements, not because the borrower will receive lower fees; and (iv) any borrower responding to the direct mail solicitation does not "choose" All Star, but will be assigned and referred by UVS/Hypotec to All Star.

122. Plaintiff believes, and therefore avers, that UVS/Hypotec makes similar false representations by other means, e.g. as in telemarketing and "live transfer" phone calls with borrowers.

### III.   UVS/Hypotec's and All Star's  False Allocation of Fees and APR Manipulation

123. The Truth in Lending Act ("TILA") mandates that lenders report to borrowers the Annual Percentage Rate, or "APR", associated with a loan, refinance, or reverse mortgage. While the interest rate of a loan is the cost to borrow the principal loan amount, the APR includes both the interest rate of the loan plus certain other lender fees, such as origination fees, discount points and some closing costs, including some title and settlement service fees.  The APR is intended as a tool for borrowers to compare, among other things, closing and settlement costs across loans with similar interest rates and to easily identify when one loan has substantially higher fees than another loan at the same interest rate.  Lenders are required to report to borrowers a calculation of the APR on various loan documents, including the TILA disclosure.

124. The title and settlement service fees that are excluded in the APR calculation are defined by TILA.  12 C.F.R. § 1026.4(c). Because some fees are excluded from the APR (and others are not), title and settlement service companies and lenders can manipulate – and falsely minimize – the APR by choosing to falsely allocate amounts charged for title and settlement services to those categories of fees that are excluded from the APR calculation.

125. As a regular and continuing business practice, Abitbol, UVS/Hypotec and All Star choose to allocate the charges for title and settlement services associated with a borrower's loan only to those categories of title services not included in the APR, thereby falsely minimizing the APR reported on borrowers' loan documents and required federal

disclosures and to conceal the Kickback and Cartel Agreements, and the resulting supracompetitive prices charged to borrowers for title and settlement services.

126. For example, fees for "title examination", "abstract of title" and "title insurance" are excluded from the APR calculation – see, 12 C.F.R. § 1026.4(c)(7)(i) – while a settlement or closing fee, or an application signing fee, is a settlement service cost required to be included in the APR calculation. See 12 C.F.R. § 1026.4(a)(1)(i). By allocating the charges associated with conducting a settlement or closing with a borrower to the category of "title exam" or "abstract" the result would be a false, and falsely minimized, APR.

127. All Star chooses to employ the false allocation of fees and manipulation of the APR as a regular business practice as early as 2011 and at least through October, 2015, allocating all charges for title and settlement service to "Title Exam" or "Abstract" because those fees are excluded from, and do not raise, the APR, and thereby assists in fraudulently concealing the Kickback and Cartel Agreements and the resulting supracompetitive prices charged borrowers for title and settlement services. *See, e.g.*, June 6, 2011 e-mail, attached as **Exhibit 26**; September 24, 2015 e-mail, attached as **Exhibit 27**; October 6, 2015 e-mail, attached as **Exhibit 28**.

128. UVS/Hypotec participates in and ratifies this false allocation of fees. *See* **Exhibit 29**, Oct. 26, 2011 e-mail between UVS and All Star allocating charges for settlement service to title insurance because they do not affect the APR. Based on this continuing pattern of practice, Plaintiff believes, and therefore avers, that All Star and UVS/Hypotec engage in the false allocation and manipulation of the APR throughout the time period UVS/Hypotec is participating in the All Star Scheme as one of the ways to conceal the

Kickback and Cartel Agreements and the resulting supracompetitive prices charged to borrowers for title and settlement services.

129.    For example, despite conducting a settlement or closing with each borrower, All Star and UVS/Hypotec choose to not allocate any amount of All Star's charges associated with a borrower's loan to "settlement or closing fee" because that charge is included in the APR. Instead, All Star and UVS/Hypotec allocate all charges, including that portion attributable to conducting a settlement or closing, to "Title Exam", "Abstract" or "Title Insurance", which are excluded from the APR.  *See* **Exhibit 29**.

130.    UVS/Hypotec's and All Star's choice to falsely allocate fees resulted in the fraudulent reporting of false APRs and the false, and falsely minimized, representation of the cost of the UVS/Hypotec loan to borrowers.

131.    The UVS/Hypotec's and All Star's choice to falsely allocate fees and fraudulently report these false allocations in borrowers' loan documents concealed from borrowers the supracompetitive pricing of title and settlement services resulting from the Kickback and Cartel Agreements and prevented borrowers from discovering the supracompetitive nature of the pricing through comparison to UVS/Hypotec's and All Star's competitors.

132.    As a regular business practice, All Star used various software programs, including "Titlehound", to produce borrower loan documents, including documents reporting the APRs associated with a loan.  All Star caused this software, including Titlehound, to be programmed to make these false allocations of title and settlement service fees and the resulting false APR calculations, and to produce UVS/Hypotec's loan documents to present to borrowers and on which UVS/Hypotec and All Star intended borrowers to rely.

133.    UVS/Hypotec's and All Star's choice to falsely allocate fees and manipulate and falsely report APRs fraudulently concealed from borrowers the coordinated business relationship

between UVS/Hypotec and All Star under the Kickback and Cartel Agreements, the supracompetitive and higher prices for title and settlement services resulting from the Kickback and Cartel Agreements, and affirmatively prevented borrowers from discovering their injuries resulting therefrom.

### IV.    False Representations in Borrowers' Loan Documents

134.    In addition to false representations in marketing communications to borrowers and the choice to misrepresent the actual APRs through the intentionally classifying some of All Star's charges as non-APR related charges, UVS/Hypotec and All Star choose to make false representations on borrowers' loan documents.

135.    At all relevant times, federal law requires UVS/Hypotec, as lender or broker, to provide a "Good Faith" Estimate to the borrower within three days of taking a loan application. 12 C.F.R. § 1024.7(a)-(b).

136.    Federal law requires Block 4 of the "Good Faith" Estimate to only state the charges for "title services and lender's title insurance".

137.    As a regular pattern of practice, UVS/Hypotec chooses to falsely include in Block 4 charges that are not title services and lender's title insurance including the UVS/Hypotec Overcharge (see ¶¶ 90 – 93, 97, 99, 101), Kickback Surcharge (¶¶ 92, 94, 100), Enhanced Title Surcharge (¶ 95), Unlicensed State Surcharge ((¶¶ 88, 98), and other flat fee overcharges associated with the Price Fixing and Minimum Fee Agreements.

138.    UVS/Hypotec's choice to falsely include these charges in Block 4 of the "Good Faith" Estimate, contrary to federal law,  conceals from borrowers: (i) the charges and amounts associated with the surcharges and flat fixed fees, (ii) the fixed and supracompetitive nature of the charges, (iii) the illegal kickbacks, and (iv) the coordinated business

relationship between Abitbol, UVS/Hypotec and All Star under the Kickback and Cartel Agreements.

139.   In addition to the GFE, federal law, at all relevant times, requires each borrower to be provided with a HUD-1 Settlement Statement at the closing or settlement of a loan.  The settlement agent is required to produce the HUD-1, but federal regulations require the lender or broker to provide to the settlement agent all information appearing in the HUD-1 statement.

140.   Section 1100 of the HUD-1 reports to the borrower the title and settlement services provided on the loan, along with the associated charges to the borrowers for those services.

141.   As a continuing pattern and regular business practice, UVS/Hypotec and All Star choose and cause the false allocation of fees described in ¶¶ 123 - 133  (the "APR and GFE Misrepresentations") to repeat and appear on UVS/Hypotec borrowers' HUD-1 statements in Section 1100.

142.   As a continuing pattern and regular business practice, UVS/Hypotec chooses to omit and chooses not to describe anywhere on a borrower's HUD-1 statement the amount of the kickback received by UVS/Hypotec related to the borrower's loan or the fact that All Star has paid a kickback to UVS/Hypotec for the assignment and referral of the borrower's loan.  UVS/Hypotec is required to report the kickback on Line 801 or Line 808 of the HUD-1.

143.   As a continuing pattern of practice, UVS/Hypotec chooses to omit and chooses to not describe anywhere on a borrower's HUD-1 statement that the borrower is being charged or the amount of any UVS/Hypotec Overcharge, Kickback Overcharge, Enhanced Title Surcharge, Unlicensed State Surcharge, or other flat fees associated with the fixed prices

under the Cartel Agreements.  UVS/Hypotec is required to report these amounts in Section 1100 or Section 1300 of the HUD-1.

144. As a continuing pattern of practice, UVS/Hypotec, and its loan officers, employees and/or agents including Abitbol, chooses to omit and chooses not to describe anywhere on a borrower's HUD-1 statement that UVS/Hypotec ultimately receives a portion of the charges listed in Section 1100 of the HUD-1, falsely stating instead that All Star retains all amounts paid by the borrower. This representation is false because All Star in fact splits a portion of the Section 1100 charges to kick back to UVS/Hypotec under the Kickback and Cartel Agreements.

145. The choices to make these false representations and to omit this information on federally required forms presented to the UVS/Hypotec borrowers by All Star as UVS/Hypotec's agent at closing, fraudulently conceals: (i) the charges and amounts associated with the surcharges, overcharges, and flat fixed fees, (ii) the fixed and supracompetitive nature of the charges, (iii) the illegal kickbacks, and (iv) the coordinated business relationship between UVS/Hypotec and All Star under the Kickback and Cartel Agreements.

146. Individually and collectively, UVS/Hypotec's and All Star's  affirmative acts of concealment – the laundering of kickbacks through third party marketing companies, the related creation of sham invoice and payment records, false marketing statements, false allocation of fees and manipulation of the reported APR, and misrepresentations and omissions on borrowers "Good Faith" Estimates, HUD-1s, and other loan documents – are outside the control of UVS/Hypotec's borrowers, including Plaintiff and Class Members, and are in the sole control of, and the result of choices by, UVS/Hypotec, including Abitbol, and All Star.

V.       **Plaintiff's Reasonable Diligence**

147. As a result of the fraudulent concealments by UVS/Hypotec and All Star, Plaintiff Obiefuna (and, upon information and belief, all alleged Class Members) had no actual notice before, at or after the closing of her loan of the illegal kickbacks, the exchange of any thing of value between UVS/Hypotec and All Star, the Price Fixing and Minimum Fee Agreements or the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship between UVS/Hypotec, Abitbol, and All Star under the Kickback and Cartel Agreements.

148. Plaintiff exercised reasonable diligence before, during and after the closing of her loan.

149. Plaintiff Obiefuna receives loan documents prepared by UVS/Hypotec in advance of her closing and reviews those loan documents.

150. Plaintiff Obiefuna believes, and therefore avers, that her pre-closing loan documents include a "Good Faith" Estimate prepared by UVS/Hypotec.  Plaintiff Obiefuna is not in possession of the "Good Faith" Estimate issued regarding her refinance and believes that document is in the sole possession of UVS/Hypotec.

151. Plaintiff Obiefuna believes, and therefore avers, that UVS/Hypotec and All Star choose to omit from her "Good Faith" Estimate any description or statement of the coordinated business relationship between UVS/Hypotec and All Star and to include the fraudulent representations and omissions described in ¶¶ 135 – 38 (the "GFE Misrepresentations"). Plaintiff Obiefuna believes and therefore avers that her "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to her refinance.

152. Plaintiff Obiefuna believes, and therefore aver, that UVS/Hypotec and All Star include in her pre-closing documents UVS/Hypotec and All Star's false allocation of fees and a false APR as described in ¶¶ 123 – 133 (the "APR Misrepresentations").

153.   Abitbol's, UVS/Hypotec's and All Star's choices to make the false statements and omissions in Plaintiff Obiefuna's pre-closing loan documents were done for the purposes of concealing, and did so conceal from Plaintiff Obiefuna, the coordinated business relationship between UVS/Hypotec, Abitbol and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to Plaintiff Obiefuna's loan, and the fixed and supracompetitive nature of prices charged Plaintiff Obiefuna for title and settlement services.

154.   As is reasonable under the circumstances, Plaintiff Obiefuna believes these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and Plaintiff Obiefuna did not believe, that: (i) a coordinated business relationship exists between UVS/Hypotec, Abitbol and All Star; (ii) there has been any payment or exchange of a thing of value between UVS/Hypotec, Abitbol and All Star related to the assignment and referral of Plaintiff Obiefuna's loan for title and settlement services, or (iii) the prices she will be charged for title and settlement services are fixed and supracompetitive or the result of Kickback and Cartel Agreements between UVS/Hypotec, Abitbol and All Star.

155.   Plaintiff Obiefuna acts diligently during the closing or settlement of her loan.  As a condition of funding her loan, UVS/Hypotec requires Plaintiff Obiefuna to participate in a closing, and she attends and fully participates in the required closing.

156.   At the closing of their loan, Plaintiff Obiefuna receives from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.

157.   UVS/Hypotec, Abitbol and All Star choose to omit from the documents Plaintiff Obiefuna receives at closing, including Plaintiff Obiefuna's HUD-1, any description or

37

statement of the coordinated business relationship between UVS/Hypotec, Abitbol and All Star under any of the Kickback or Cartel Agreements.

158.   UVS/Hypotec, Abitbol and All Star choose to omit from the documents Plaintiff Obiefuna receives at closing, including her HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to UVS/Hypotec and/or Abitbol related to Plaintiff Obiefuna's loan.

159.   UVS/Hypotec, Abitbol, and All Star choose to include in Section 1100 of Plaintiff Obiefuna's HUD-1 the fraudulent representations described in ¶ 144.

160.   Plaintiff Obiefuna believes, and therefore avers, that UVS/Hypotec and All Star choose to include in the documents Plaintiff Obiefuna receives at closing, including her HUD-1, the false allocation of fees as described in ¶¶ 123 – 133, the APR misrepresentations, and the resulting fraudulent representations and omissions as described in ¶¶ 139 – 144, the GFE Misrepresentations.

161.   UVS/Hypotec and All Star choose to make the fraudulent omissions and representations and false certifications in Plaintiff Obiefuna's loan closing documents for the purposes of concealing, and did so conceal from Plaintiff Obiefuna, the coordinated business relationship between UVS/Hypotec and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to Plaintiff Obiefuna's loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and Plaintiff Obiefuna's injuries and actual damages therefrom.

162.   As is reasonable under the circumstances, Plaintiff Obiefuna believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff Obiefuna does not believe, that: (i) a coordinated business relationship exists between UVS/Hypotec and All Star; (ii) there has been any payment

38

or exchange of a thing of value between UVS/Hypotec and All Star related to the assignment and referral of Plaintiff Obiefuna's loan for title and settlement services; (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between UVS/Hypotec and All Star.

163.    Plaintiff Obiefuna acts diligently after her closing. On or about December 28, 2018, Plaintiff Obiefuna receives a letter from undersigned counsel describing an investigation of All Star and UVS, which is the former name of Hypotec.  This is Plaintiff Obiefuna's first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

164.    Within days, Plaintiff Obiefuna contacts and retains counsel.  Plaintiff Obiefuna files this Complaint within months of becoming aware of facts giving rise to her causes of action.

### VI.    Accrual and Tolling of Limitations

165.    Plaintiff Obiefuna's claims pursuant to pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 accrued at the earliest, for the purpose of the limitations period provided in 15 U.SC. § 15(b), on the date of her injury, that is on or about October 21, 2015, the date her loan proceeds were disbursed and Plaintiff Obiefuna incurred and paid the fixed and supracompetitive prices resulting from the Kickback and Cartel Agreements.  Plaintiff Obiefuna's claims are brought within four years of that date, and are not subject to any limitations defense.

166.    In addition, and in the alternative, the limitations period provided in 15 U.S.C. § 15(b), applicable to claims pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964**,** is subject to the discovery of injury rule. *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1464 (7th Cir. 1992). Abitbol and UVS/Hypotec's affirmative acts precluded borrowers, including Plaintiff and Class Members, from discovering the fixed and supracompetitive nature of the prices charged for title and settlement services, and affirmatively prevented borrowers,

including Plaintiff and Class Members, from discovering the fact of their injuries and harm resulting therefrom.

167. As a result, Plaintiff's, and Class Members', claims pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 did not accrue, for the purpose of the limitations period provided in 15 U.SC. § 15(b), until such time as Plaintiff, and Class Members, knew, or should have known, of their injury: for Plaintiff Obiefuna, on or about December 28, 2018.

168. In addition and in the alternative, as a result of the fraudulent concealments by Abitbol, UVS/Hypotec and All Star and Plaintiff's reasonable diligence before, during and after the closing of Plaintiff's loan, the statute of limitations as to all causes of action pled herein are and should be tolled beginning on the date of Plaintiff's loan closing and continuing until the learning of facts giving rise to the causes of action pled herein: for Plaintiff Obiefuna, on or about December 28, 2018.

169. Plaintiff believes, and therefore avers, that the fraudulent concealments described herein were an integral component of the Kickback and Cartel Agreements and the All Star Scheme, and typical of all alleged Class Members' transactions such that all Class Members are entitled to the equitable tolling of applicable limitations period.

## COUNT I
### Violation of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2607(a) and (b)

170. Plaintiff incorporates the above stated paragraphs as if restated herein.

171. All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

172. UVS/Hypotec, by and through its mortgage brokers, loan officers, employees and/or agents including Abitbol, received and accepted things of value paid by All Star in

exchange for the assignment and referral of business to All Star in violation of RESPA, 12 U.S.C. § 2607(a).

173.    UVS/Hypotec by and through its mortgage brokers, loan officers, employees and/or agents, including Abitbol, received and accepted illegal fee splits from All Star, wherein All Star split a portion of the fees charged borrowers and paid such portion or split to UVS/Hypotec and/or Abitbol, in violation of RESPA 12 U.S.C. § 2607(b);

174.    All loans assigned and referred to All Star under the Kickback Scheme were secured by first or subordinate liens on residential real property and were funded in whole or in part by UVS/Hypotec and/or their affiliates whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

175.    The payment and/or arranging of payment of kickbacks to UVS/Hypotec and/or Abitbol by All Star and UVS/Hypotec's and/or Abitbol's receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

176.    Plaintiff alleges claims for violations of 12 U.S.C. §2607(a) and (b) on her own behalf and pursuant to Fed. R. Civ. P. 23 with the class defined as follows:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by Allegro Funding Corporation, U.V.S., Inc. or Hypotec, Inc., for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2010 and December 31, 2016. Exempted from this class is any person who, during the period of January 1, 2010 through December 31, 2016, was an employee, officer, member and/or agent of Allegro Funding Corporation, U.V.S., Inc., Hypotec, Inc., or All Star Title, Inc.
>
> (the "RESPA Class").

177.  There are questions of law and fact common to the claims of each and all members of the RESPA Class. These common questions include, but are not limited to:

a.  Whether there existed a referral agreement between UVS/Hypotec and All Star whereby UVS/Hypotec agreed to assign and refer loans, refinances and reverse mortgages brokered or originated by UVS/Hypotec to All Star in return for kickbacks;

b.  Whether UVS/Hypotec and their employees and/or agents received illegal kickbacks from All Star for the assignment and referral of business to All Star;

c.  Whether the illegal kickbacks to UVS/Hypotec and their employees and/or agents violated RESPA;

d.  Whether UVS/Hypotec and All Star used third party marketing companies to launder kickbacks related to UVS/Hypotec loans;

e.  Whether Plaintiff and RESPA Class Members were forced to pay more for said settlement services;

f.  Whether UVS/Hypotec used sham and/or split invoices and sham payment records to actively and fraudulently conceal the payment, receipt and acceptance of illegal kickbacks;

g.  Whether UVS/Hypotec disclosed or described to any borrower their coordinated business relationships with All Star or the fact that a thing of value had been exchanged between UVS/Hypotec and All Star related to any borrower's loan;

h.  Whether UVS/Hypotec disclosed or described on any borrower's "Good Faith" Estimate, HUD-1 or other loan document UVS/Hypotec's coordinated business

relationships with All Star or the fact that a thing of value had been exchanged between UVS/Hypotec and All Star related to any borrower's loan;

i.   Whether despite exercising reasonable due diligence, Plaintiff and RESPA Class Members did not and could not have learned of the illegal kickbacks until contacted by counsel;

j.   Whether Plaintiff and RESPA Class Members are entitled to treble damages under RESPA; and

k.   Whether Plaintiff and RESPA Class Members are entitled to attorneys' fees and expenses under RESPA.

178.  These common issues of law and fact predominate over any question affecting only individual RESPA Class Members.

179.  Plaintiff's transaction and claim is typical of the claims or defenses of the respective RESPA Class Members, and are subject to the same statutory measure of damages set forth in 12 U.S.C. § 2607(d)(2).

180.  Plaintiff will fairly and adequately protect the interests of the RESPA Class.  The interests of Plaintiff and all other members of the RESPA Class are identical.

181.  Plaintiff's counsel has substantial experience in complex litigation and class action proceedings, have been approved as class and settlement class counsel in multiple U.S. District Courts in similar litigation, and will adequately represent the RESPA Class's interests.

182.  The RESPA Class consists of borrowers on more than 1,200 loans, and thus are so numerous that joinder of all members is impracticable.

183. Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for UVS/Hypotec.

184. This action entails questions of law and fact common to RESPA Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

185. Most members of the RESPA Class are unaware of their rights to prosecute a claim against UVS/Hypotec and/or Abitbol.

186. No member of the RESPA Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

## COUNT II
## Violation of the Sherman Act,
## 15 U.S.C. § 1

187. Plaintiff incorporates the above stated paragraphs as if restated herein.

188. All Star, UVS/Hypotec and Abitbol conspired to and executed an agreement to fix the price of title and settlement services charged to borrowers on refinances, reverse mortgages, and other mortgage loans, in violation of the Sherman Act, 15 U.S.C. § 1.

189. As a direct and proximate result of the Cartel Agreements between UVS/Hypotec, Abitbol and All Star, Plaintiff and Class Members were charged and paid supracompetitive prices for title and settlement services and were charged and paid more for title and settlement services than they otherwise would have without the Cartel Agreements.

190. As a direct and proximate result of the Cartel Agreements between UVS/Hypotec, Abitbol and All Star, Plaintiff and Class Members were injured and suffered actual damages in the amount of between approximately $55-1,650, which is the minimum UVS/Hypotec Overcharge resulting from the Price Fixing and Minimum Fee Agreements between UVS/Hypotec, Abitbol and All Star.

191. In addition, and in the alternative, as a direct and proximate result of the Cartel Agreements between UVS/Hypotec and All Star, Plaintiff and Class Members were injured and suffered actual damages in the amount of applicable Kickback, Unlicensed State, and/or Enhanced Policy Surcharge resulting from the Price Fixing and Minimum Fee Agreements between UVS/Hypotec and All Star.

192. Plaintiff alleges claims pursuant to Fed. R. Civ. P. 23 for violations of 15 U.S.C. § 1 ("Antitrust Class"), with the alleged Antitrust Class defined as:

> All individuals in the United States who were borrowers on a loan originated or brokered by Allegro Funding Corporation, U.V.S., Inc. or Hypotec, Inc., for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2010 and December 31, 2017. Exempted from this class is any person who, during the period of January 1, 2010 through December 31, 2017, was an employee, officer, member and/or agent of Allegro Funding Corporation, U.V.S., Inc., Hypotec, Inc. or All Star Title, Inc.

193. The Antitrust Class consists of borrowers on more than 1,200 loans, and thus are so numerous that joinder of all members is impracticable.

194. There are questions of law and fact common to the claims of each and all members of the Antitrust Class. These common questions include, but are not limited to:

  a. Whether UVS/Hypotec and their employees and/or agents violated the Sherman Act by conspiring to and fixing the title and settlement services fees charged to and paid by Plaintiff and Antitrust Class Members;

b.  Whether UVS/Hypotec  and their employees and/or agents, including Abitbol, violated the Sherman Act by conspiring to and agreeing to supporting the Price Fixing and Minimum Fee Agreements through a concerted refusal to deal with non-cartel title and settlement service companies on all loans generated by UVS/Hypotec by the Kickback Agreement;

c.  Whether the prices charged borrowers on loans brokered or originated by UVS/Hypotec pursuant to the Cartel Agreements were supracompetitive, and higher than prices that would have been charged without the Cartel Agreements;

d.  Whether UVS/Hypotec made false representations to borrowers to actively conceal the Cartel Agreements and supracompetitive prices resulting therefrom;

e.  Whether All Star falsely allocated fees to actively conceal the Cartel Agreements and the supracompetitive prices charged borrowers on loans brokered or originated by UVS/Hypotec in performance of those agreements;

f.  Whether UVS/Hypotec made false representations on borrowers' Good Faith Estimates, HUD-1s and other loan documents to actively conceal the Cartel Agreements and the supracompetitive prices charged borrowers on loans brokered or originated by UVS/Hypotec in performance of those agreements;

g.  Whether despite exercising reasonable due diligence, Plaintiff and Class Members did not and could not have learned of the Cartel Agreements, the supracompetitive prices charged for title and settlement services, and their injuries and actual damages therefrom, until contacted by counsel;

h.  Whether Plaintiff and the Antitrust Class are entitled to treble damages under the Sherman Act; and

     i.    Whether Plaintiff and the Antitrust Class are entitled to attorneys' fees and expenses under the Sherman Act.

195.   These common issues of law and fact predominate over any question affecting only individual Antitrust Class Members.

196.   Plaintiff's transaction and claim is typical of the claims or defenses of the respective Antitrust Class Members, and are subject to the same statutory measure of damages set forth in 15 U.S.C. § 15(a).

197.   Plaintiff will fairly and adequately protect the interests of the Antitrust Class. The interests of the named Plaintiff and all other members of the Antitrust Class are identical.

198.   Plaintiff's counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the Antitrust Class's interests.

199.   Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for UVS/Hypotec.

200.   This action entails questions of law and fact common to Antitrust Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

201.   Most members of the Antitrust Class are unaware of their rights to prosecute a claim against UVS/Hypotec or Abitbol.

202.   No member of the Antitrust Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**COUNT III**
**Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO),**
**18 U.S.C. § 1962**

203. Plaintiff incorporates the above stated paragraphs as if restated herein.

204. UVS/Hypotec and Abitbol, are each a "person" as defined under 18 U.S.C. § 1961(3).

205. The All Star Scheme constitutes an enterprise for the purposes of 18 U.S.C. § 1962(c) ("All Star Scheme Enterprise"). The activities of the All Star Scheme Enterprise affect interstate commerce across more than 30 states.

206. UVS/Hypotec and Abitbol are employed by or associated with the All Star Scheme Enterprise.

207. UVS/Hypotec agreed to and did conduct and participate in conducting the affairs of the All Star Scheme Enterprise through a pattern of racketeering activity and for the unlawful purpose of defrauding borrowers into paying fixed and supracompetitive prices for title and settlement services related residential mortgage, refinance and reverse mortgages brokered or originated by UVS/Hypotec, and to thereby deprive borrowers of their money and/or property and/or the intangible right to honest services.

208. The repeated use of the U.S. Mail and interstate wires by UVS/Hypotec, Abitbol and All Star over a period of more than five years and involving over 1,200 borrowers in furtherance of the All Star Scheme and All Star Scheme Enterprise as pled herein, constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

209. UVS/Hypotec and Abitbol have directly and indirectly conducted and participated in the conduct of the All Star Scheme Enterprise's affairs, which affected interstate commerce in more than 30 states, through the pattern of racketeering activity pled herein, in violation of 18 U.S.C. § 1962(c).

210. As a direct and proximate result of UVS/Hypotec' participation in the All Star Scheme and All Star Scheme Enterprise through the pattern of racketeering activity pled herein, Plaintiff and Class Members were injured and suffered actual damages in the amount of between approximately $55-1,650, which is the minimum amount of the UVS/Hypotec Overcharge resulting under the Price Fixing and Minimum Fee Agreements with UVS/Hypotec.

211. In addition, as a direct and proximate result of UVS/Hypotec' participation in the All Star Scheme Enterprise through the pattern of racketeering activity pled herein, Plaintiff and Class Members were deprived of the intangible right of honest services by UVS/Hypotec and its employees and agents.

212. Plaintiff alleges claims pursuant to Fed. R. Civ. P. 23 for violations of 18 U.S.C. § 1962(c) ("RICO Class"), with the alleged RICO Class defined as:

> All individuals in the United States who were borrowers on a loan originated or brokered by the Allegro Funding Corporation, U.V.S., Inc. or Hypotec, Inc. for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2010 and December 31, 2017. Exempted from this class is any person who, during the period of January 1, 2010 through December 31, 2017, was an employee, officer, member and/or agent of the Allegro Funding Corporation, U.V.S., Inc., Hypotec, Inc., or All Star Title, Inc.

213. The RICO Class consists of borrowers on more than 1,200 loans, and thus are so numerous that joinder of all members is impracticable.

214. There are questions of law and fact common to the claims of each and all members of the RICO Class. These common questions include, but are not limited to:

   a. Whether UVS/Hypotec and its employees and/or agents violated RICO by defrauding borrowers, including Plaintiff and RICO Class Members, into paying

supracompetitive prices for title and settlement services and fund the kickbacks All Star is paying UVS/Hypotec;

b.  Whether UVS/Hypotec and All Star formed an enterprise;

c.  Whether the activities of the All Star Scheme Enterprise affected interstate commerce;

d.  Whether one purpose of the All Star Scheme Enterprise was to deprive borrowers of money or property;

e.  Whether one purpose of the All Star Scheme Enterprise was to deprive borrowers of the intangible right of honest services;

f.  Whether UVS/Hypotec and All Star used the interstate U.S. Mail in furtherance of the All Star Scheme and All Star Scheme Enterprise;

g.  Whether UVS/Hypotec and All Star used interstate wires in furtherance of the All Star Scheme and the All Star Scheme Enterprise;

h.  Whether the use of interstate U.S. mail and wires constitutes a pattern of racketeering activity;

i.  Whether UVS/Hypotec conducted or participated in the All Star Scheme Enterprise through a pattern of racketeering activity;

j.  Whether UVS/Hypotec actively concealed the All Star Scheme, the supracompetitive prices, and the All Star Scheme Enterprise;

k.  Whether Plaintiff's and RICO Class members knew or should have known of their injuries resulting from UVS/Hypotec' violation of 18 U.S.C. § 1962(c);

l.  Whether UVS/Hypotec and All Star's fraudulent concealments prevented Plaintiff and RICO Class members from discovering their injuries proximately caused by

UVS/Hypotec' participation in the All Star Scheme Enterprise through a pattern of racketeering activity;

m. Whether Plaintiff and the RICO Class are entitled to treble damages pursuant to 18 U.S.C. § 1964(c); and

n. Whether Plaintiff and the RICO Class are entitled to attorneys' fees and expenses pursuant to 18 U.S.C. § 1964(c).

215. These common issues of law and fact predominate over any question affecting only individual RICO Class Members.

216. Plaintiff's transaction and claim is typical of the claims or defenses of the respective RICO Class Members, and are subject to the same statutory measure of damages set forth in 18 U.S.C. § 1964(c).

217. Plaintiff will fairly and adequately protect the interests of the RICO Class. The interests of the named Plaintiff and all other members of the RICO Class are identical.

218. Plaintiff's counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the RICO Class's interests.

219. Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for UVS/Hypotec.

220. This action entails questions of law and fact common to RICO Class members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

221.  Most members of the RICO Class are unaware of their rights to prosecute a claim against UVS/Hypotec.

222.  No member of the RICO Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**WHEREFORE**, Plaintiff respectfully demands:

a.  This Court to certify the RESPA, Antitrust, and RICO Classes pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial;

b.  Judgment for Plaintiff and RESPA Members against Defendants Hypotec, Inc. and Abitbol, jointly and severally, and award Plaintiff and RESPA Class Members treble damages for title and settlement services charged by All Star, including, but not limited to, title insurance premiums, in an amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

c.  Judgment for Plaintiff and Antitrust Class Members against Defendants Hypotec, Inc., and Abitbol, jointly and severally, and award Plaintiff and Antitrust Class Members damages in the amount equal to three times the actual damages caused by the Cartel Agreements pursuant to 15 U.S.C. § 15(a);

d.  Judgment for Plaintiff and RICO Class Members against Defendants Hypotec, Inc., and Abitbol, jointly and severally, and award Plaintiff and RICO Class Members damages in the amount equal to three times the actual damages caused by the All Star Scheme pursuant to 18 U.S.C. § 1964(c);

e.  Reasonable attorneys' fees, interest and costs pursuant to 12 U.S.C. § 2607(d)(5), 15 U.S.C. § 15(a), and 18 U.S.C. § 1964(c); and

f.  For such other and further relief as this Court deems proper.

Respectfully submitted,

  */s/ Steven C. Coffaro*
Steven C. Coffaro, Esq. (19767-15)
Gregory M. Utter, Esq.*, pro hac pending*
Keating Muething & Klekamp PLL
One East Fourth Street, Suite 1400
Cincinnati, OH 45202
(513) 579-6489 / (513) 579-6457 (fax)
Email: gmutter@kmklaw.com
      steve.coffaro@kmklaw.com
*Co-Counsel for Plaintiff and Class Members*

Michael Paul Smith, Esq., *pro hac pending*
Melissa L. English, Esq., *pro hac pending*
Sarah A. Zadrozny, Esq., *pro hac pending*
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, Maryland 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
menglish@sgs-law.com
szadrozny@sgs-law.com
*Counsel for Plaintiff and Class Members*

Timothy F. Maloney, Esq., *pro hac pending*
Veronica B. Nannis, Esq., *pro hac pending*
Megan A. Benevento, Esq., *pro hac pending*
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
(301) 220-2200 / (301) 220-1214 (fax)
Email: tmaloney@jgllaw.com
vnannis@jgllaw.com
mbenevento@jgllaw.com
*Co-Counsel for Plaintiff and Class Members*

## **JURY DEMAND**

Plaintiff and Class Members hereby demand a trial by jury on all claims so triable in the foregoing Class Action Complaint.

9065407.1