UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SHEILA OBIEFUNA, | ) | |
| ANDREA COLBERT JOSEPH, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-01039-SEB-DLP |
| | ) | |
| HYPOTEC, INC., | ) | |
| FREDERIC ABITBOL, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTION TO DISMISS

Plaintiffs Sheila Obiefuna and Andrea Colbert Joseph, on behalf of themselves and

those similarly situated, initiated this action on March 15, 2019, alleging that Defendants

Hypotec, Inc. ("Hypotec") and Frederic Abitbol violated the Real Estate Procedures Act

("RESPA"), 12 U.S.C. § 2601 *et. seq.* (Count I); the Sherman Act, 15 U.S.C. § 1 (Count

II), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §

1961 *et seq.* (Count III). Now before the Court is Defendants' Motion to Dismiss [Dkt.

24] all claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). For the

reasons set forth herein, we **grant in part and deny in part** Defendants' Motion to

Dismiss.

## FACTS

Plaintiffs' claims are based on the following alleged facts:

Plaintiffs Obiefuna and Joseph and alleged Class Members are all borrowers who

currently have or had a residential mortgage originated and/or brokered by Defendant

1

Hypotec[1] and the entity's president, Frederic Abitbol, (collectively "Hypotec"), which was or is secured by Plaintiffs' real property. [Am. Compl., ¶ 1]. At all relevant times, Hypotec was engaged in the business of consumer mortgage brokering, origination, and lending.

## I.    Facts Relating to the Alleged RESPA Violations

### 1.    The All Star Scheme

Plaintiffs claim to be the victims of an illegal scheme (the "All Star Scheme") between Hypotec and All Star Title, Inc. ("All Star"), a Maryland-based title and settlement services company. [*Id.* ¶ 2]. In brief, Plaintiffs allege that Hypotec, acting pursuant to this scheme,  received and accepted illegal kickbacks in exchange for the assignment and referral of residential mortgage loans, refinances, and reverse mortgages to All Star for title and settlement services (the "Kickback Agreement"). Hypotec and All Star allegedly laundered these kickbacks through third-party marketing companies in order to conceal the discovery of the kickbacks as well as the larger Kickback Agreement. [*Id.* ¶ 3].

Before Hypotec ever became involved, All Star designed and executed the "All Star Scheme" in 2008 for the purpose of effectuating kickback agreements, such as the one described above, to various "participating lenders."[*Id.* at 17]. The monetary amount of the kickback paid to the lender was based upon the number of loans assigned and referred to All Star and the amount of profit realized by All Star. [*Id.* ¶ 18].

---

[1] Hypotec was formerly known as U.V.S. Inc. or Allegro Funding Corporation.

These kickbacks were laundered by and through different channels. [*Id.* ¶ 19]. In some instances, All Star would pay kickbacks by purchasing and delivering marketing materials to a lender for the lender to use in soliciting borrowers. [*Id.* ¶ 20]. In other instances, All Star would pay cash kickbacks. Often, a lender would receive and accept a kickback laundered through a "sham entity set up for the express purpose of receiving and accepting kickbacks and concealing the same." [*Id.* ¶ 21-22].

In most instances, in order to conceal the existence of the kickbacks, lenders and All Star would agree to have All Star refrain from directly issuing a check to the lenders, but instead would launder the kickback through a third-party marketing company identified by the lenders. [*Id.* ¶ 22, 25]. Lenders would use third-party marketing companies ("such as a direct mail, data and/or leads lists, telemarketing or live transfer leads provider") to provide marketing services aimed at soliciting borrowers to obtain residential mortgage loans, refinances, and reverse mortgages. This would increase the volume of loans the lenders brokered or originated, thereby increasing its net profit and commissions in the form of kickbacks. [*Id.* ¶¶ 23, 24]. Under this arrangement, All Star would make the kickback payments to the third-party marketing company, and the lender would receive and accept the kickback by virtue of the third-party marketing company's applying the payment to the invoice for marketing services that were utilized for the benefit of the participating lender. [*Id.* ¶ 25].

As further concealment of the ongoing kickbacks, All Star and the lenders requested third party marketing companies to issue "sham invoices" falsely identifying All Star as the company purchasing and receiving marketing services, when, in fact, the

purchase and payment of the services was a kickback received and accepted by the lender in exchange for the assignment and referral of loans to All Star. [*Id* ¶ 26]. In other words, these "sham invoices" concealed the fact that anything of value had been exchanged between All Star and the lenders. [*Id.* ¶ 27].

On certain occasions, the third-party marketing company, at the direction of All Star and the participating lender, would issue "split" invoices to both All Star and the lender for a portion of the amount due to the third party. [*Id.* ¶ 28]. This further created the impression that All Star was purchasing marketing services when, in truth, the marketing services were a form of a kickback. [*Id.* ¶ 29]. The omission of the lender's information on the invoice issued to All Star further concealed the business relationship between All Star and the lender. [*Id.*]

On other occasions, All Star and the lenders concealed the kickback payment by creating "sham" payment records. [*Id.* ¶ 30]. In these instances, a lender would direct All Star to launder a kickback through the third-party marketing company without the use or issuance of any invoice. [*Id.*].

This scheme was predicated on the lenders' abilities to meet unit or productions goals with respect to loans that were assigned or referred to All Star. By concealment of these kickback agreements through third party marketing companies and the use of sham invoices and payment records, Plaintiffs assert that lenders hoped to disguise unlawful kickbacks as lawful co-marketing. [*Id.* ¶ 32].

2. Hypotec's Participation in the All Star Scheme

In April 2010, Mr. Abitbol was engaged in brokering loans on behalf of Hypotec, which was funded by Allegro Funding Corporation ("Allegro). [*Id.* ¶ 56]. It was during this time that Hypotec began participating in the All Star Scheme. [*Id.* ¶ 57]. Specifically, All Star began paying kickbacks to Hypotec in exchange for the assignment and referral of Allegro loans to All Star for title and settlement services. [*Id.*] The kickbacks were laundered through a marketing services company, Titan List and Mailing Services ("Titan"). [*Id.*].

"Sham" invoices associated with the kickback payments show that Titan produced, printed, and mailed borrower solicitations on behalf of Hypotec. [*Id.* ¶ 59, 69]. These invoices indicate that Hypotec used the kickback payments to cause solicitations to be mailed to potential borrowers in order to lure them in the All Star Scheme. [*Id.* ¶ 60, 69]. Hypotec specifically received the kickbacks by virtue of All Star's issuance of payments for Titan's services. [*Id.* ¶ 62, 71]. These kickbacks were made based on an agreement between Hypotec and All Star wherein All Star would provide kickbacks to Hypotec so long as Hypotec met certain production requirements with respect to its assignments and referrals to Hypotec. [*Id.* ¶ 63].

Hypotec did, in fact, assign and refer loans to All Star pursuant to this agreement. [*Id.* ¶ 64]. In its first year of participation, Hypotec assigned and referred more than 230 Allegro loans to All Star [*Id.* ¶ 65], receiving more $750,000 in kickbacks from All Star in the following two years. [*Id.*, p. 15]. Some of these kickbacks were laundered through Titan [*See id.* ¶¶ 66-71], though, at some point, All Star began laundering kickbacks to

Hypotec by virtue of another marketing company, Aziza Marketing, Inc. ("Aziza"), [*Id.* ¶ 72], as well as a call center, "GuateCall." [*Id.* ¶ 75]. The laundering schemes engaged in with these marketing services providers were duplicative of those which were effectuated with Titan: All Star would issue payments for Aziza and Guatecall's marketing services performed for the benefit Hypotec. [*Id.* ¶¶ 72-78, 83-85].

From May 2011 to September 2014, Hypotec assigned and referred more 700 loans to All Star pursuant to the kickback agreement. [*Id.* ¶ 79]. These practices continued through December 2015, and, sometime in or around December 2014, All Star agreed to kickback to Hypotec $700 for every loan assigned or referred to All Star. [*Id.* ¶ 85-86]. No title services were provided by Hypotec in association with their receipt and acceptance of the kickbacks. [*Id.* ¶ 90]. Instead, the receipt and acceptance of these payments was made solely for the assignment and referrals to All Star. [*Id.*].

## II.     Facts Relating to the Alleged Sherman Act Violations

In addition to enabling the Kickback Agreement, the All Star Scheme enabled All Star to charge borrowers higher prices for title and settlement services than would otherwise have been possible in a competitive market place, permitting All Star to exclude other title companies from the market for title and settlement services on residential mortgage loans, refinances, and reverse mortgages. [*Id.* ¶ 33]. To accomplish these unlawful purposes, All Star and participating lenders conspired to form a cartel (the "All Star Lender Cartel"), leading to restraints of trade. The Cartel allowed All Star and the lenders to fix the prices All Star charged to the participating lenders' borrowers for

title and settlement services that were assigned and referred to it ("Price Fixing Agreements").

All Star and the lenders also set minimum prices to charge borrowers for these title and settlement services. ("Minimum Charge Agreement"). [*Id.* ¶ 34-36]. The Minimum Charge and Price Fixing Agreements were both enforced by a "Refusal to Deal Agreement," in which participating lenders refused to deal with any other title and settlement services company on those loans generated by the kickbacks. The Refusal to Deal Agreement, the Minimum Charge Agreement, and the Price Fixing Agreement together comprised the "All Star Lender Cartel." [*Id.* ¶ 37]. Plaintiffs believe that the prices set by All Star and the lender pursuant to these agreements are "supracompetitive and higher than the prices that borrowers would otherwise be charged for title and settlement services in a competitive market and without the Cartel agreements." [*Id.* ¶ 38]. Additionally, by excluding All Star's competitors from the market for title and settlement services, borrowers were deprived of their choice of title and settlement service provided on loans generated by the All Star funded kickbacks. [*Id.* ¶ 39].

Meanwhile, participating lenders benefitted from the Cartel Agreements and the All Star Scheme because (i) the supracompetitive pricing funded the illegal kickbacks utilized by participating lenders to solicit borrowers, generate residential mortgage loans, and earn substantial interest and commissions, and (ii) the costs for title and settlement service fees were financed into the loan and paid for by borrowers from loan proceeds such that the participating lender earned interest and other fees from the supracompetitive pricing.[Dkt. ¶ 40].

During the time Hypotec was performing its Kickback Agreement with All Star, it began executing the "Cartel Agreements" [*Id.* ¶ 92]. Beginning in July 2010, All Star and Hypotec conspired to fix prices for title and settlement services associated with Allegro loans assigned and referred to All Star by virtue of their Kickback Agreement. [*Id.* ¶ 93]. Throughout the next month, August 2010, All Star and Hypotec continued enforcing the Kickback and Refusal to Deal Agreements. Hypotec specifically demanded that All Star continue paying kickbacks based on Hypotec's commitment to the Cartel Agreements. [*Id.* ¶ 94].

At various points beginning in 2010 and continuing through 2015, Hypotec expanded their price fixing agreement with All Star, incrementally raising the agreed upon fixed prices so that All Star was charging Hypotec's borrowers more than other participating lenders' borrowers. [*See generally id.* ¶¶ 93-108]. Hypotec and All Star also memorialized their agreement that portions of these overcharges would be kicked back to Hypotec, even though it was not associated with any legitimate title insurance or service. [*Id.* ¶ 98]. Meanwhile, to replace revenue that it was splitting and kicking back to Hypotec, All Star charged Hypotec's borrowers for unnecessary endorsements and enhanced title policies on loans assigned to and referred by Hypotec pursuant to the Cartel and Kickback Agreements. ("Enhanced Title Surcharge"). [*Id.* ¶ 101].

All Star and Hypotec performed in accordance with the Cartel Agreements, including the fixed and minimum price agreements, for loans assigned and referred to All Star by Hypotec through at least November 2019. [*Id.* ¶ 108]. Hypotec's participation in

the All Star Scheme caused borrowers, including Plaintiffs, to incur damages in excess of between $55-$1800 per loan.

### III.    Facts Related to the Alleged RICO Violations

All Star and participating lenders effectively defrauded borrowers into paying supracompetitive prices for title and settlement services, thereby funding and continuing the kickback schemes that All Star paid to participating lenders, including Hypotec. [*Id.* ¶ 41]. Participating lenders and All Star, through third-party marketing companies, utilized interstate mail and wires in order to effectuate this scheme. [*Id.* ¶ 42].

Specifically, third-party marketing companies would identify potential borrowers whom they would solicit through postcards, letters, or other printed material to contact the borrowers about applying for a residential mortgage loan, refinance, or reverse mortgage. [*Id.* ¶ 43-44]. At the direction of All Star, participating lenders agreed to include false representations in these mailed solicitations, stating, for example, that a potential borrower would save "30-40% on title fees" by using All Star. Representations such as this (i) concealed the fixed, supracompetitive pricing resulting from the All Star Scheme, and (ii) created the false representation that the prices charged to the borrower for title and settlement services would be lower than the prices charged by All Star's competitors. [*Id.* ¶ 45]. Through third-party marketing companies, lenders and All Star caused various fraudulent solicitations to be to be sent through interstate mail. [*Id.* ¶ 46].

The lenders and All Star caused similar misrepresentations to be transmitted through interstate telephone wires. [*Id.* ¶ 47]. All Star and participating lenders also obtained from the third-party marketing companies borrower data and leads lists in order

to solicit borrowers over the telephone. Participating lenders used interstate wires to make these telemarketing calls to potential borrowers. "Plaintiffs believe, and therefore aver," that All Star required, and participating lenders agreed to make false representations to borrowers in these telephone solicitations similar to the false representations that All Star and participating lenders agree to include in direct mail solicitations. [*Id.* ¶ 48].

All Star and participating lenders thus administered the Kickback and Cartel Agreements over interstate wires by using interstate mails and wires to transmit, receive, and accept illegal kickback payments as well as those invoices and payment records concealing the kickback payments. In all, the activities of the All Star Scheme allegedly affected interstate commerce across more than 30 states. [*Id.* ¶¶ 50-52].

The All Star Scheme in this manner was effectuated by an association-in-fact enterprise (the "All Star Scheme Enterprise") aimed at "defrauding borrowers into paying All Star higher and supracompetitive prices for title and settlement services associated with certain loans, reducing competition in the market, and funneling illegal fee splits and kickbacks to participating lenders." [*Id.* ¶ 111]. Hypotec participated in this enterprise through their participation in the Kickback and Cartel Agreements, and through the mail and wire fraud in furtherance thereof. [*Id.* ¶ 112].

More specifically, Hypotec directed or managed the All Star Scheme Enterprise's affairs by planning and directing the commission of predicate acts of mail and wire fraud; by negotiating, directing, and controlling the amount and form in which the illegal fee splits and kickbacks were paid; by negotiating, directing, and controlling the fixed prices

charged to borrowers; and directing that borrowers' loans be assigned and referred to All Star. [*Id.* ¶¶ 113-14]. Hypotec derived benefits from these actions by virtue of the kickbacks, causing the borrowers to suffer various harms. [*Id.* ¶¶ 115-16].

## IV. Facts Specific to The Class Representatives

In October 2015, Plaintiff Obiefuna obtained a residential mortgage loan from Hypotec. The loan closed on or about October 16, 2015. [*Id.* ¶ 117]. "Plaintiff Obiefuna believes, and therefore avers," that her loan was assigned and referred to All Star in performance of the Refusal to Deal Agreement as a quid pro quo for the kickbacks All Star was providing to Hypotec during this time period. [*Id.* ¶ 119]. This scheme denied Plaintiff Obiefuna her choice of title and settlement service provider as well as her right to kickback-free title and settlement services. [*Id.*].

Ms. Obiefuna was charged by All Star fees for title and settlement services, pursuant to the Price Fixing and Minimum Fee Agreements. She believes the price for the title and settlement service fees All Star charged to her were supracompetitive and higher than the charges would have been without the Kickback and Cartel Agreements. Consequently, Ms. Obiefuna alleges harm due to her being:

> (i) charged and paid more for settlement services than she would have paid without the illegal Kickback and Cartel Agreements or the pattern of racketeering activity All Star and Hypotec conducted in furtherance of the All Star Scheme; (ii) . . . defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of her choice of title and settlement service provider and her mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

[*Id.* ¶ 124].

Plaintiff Joseph also obtained a residential loan from Hypotec in March 2012, which closed on March 21, 2012. [*Id.* ¶ 126]. She shares her co-Plaintiff's theories of liability against defendants and her factual allegations. [*Id.* ¶¶ 126-133].

## V.     Factual Allegations Related to the Statute of Limitations

Plaintiffs allege that Hypotec fraudulently concealed its wrongful acts, preventing a more timely discovery thereof.

### 1.  Concealment of the Kickbacks

As discussed, Plaintiffs allege that Hypotec and All Star concealed their Kickback Agreement by laundering kickbacks through third party marketing companies and through the creation of sham invoices and sham payment records. These acts shielded the fact that anything was exchanged of value between Hypotec and All Star related to the referral of the Hypotec loans. [*Id.* ¶¶ 135-37].

### 2.  Fraudulent Marketing Representations

Plaintiffs also allege that Hypotec and All Star made false representations to borrowers in marketing materials "to further conceal the Price Fixing, Minimum Fee Agreements, the Kickback Agreement and the resulting supracompetitive prices charged to borrowers for title and settlement services." [*Id.* ¶ 138]. Plaintiffs specifically take issue with Hypotec's representations that "a borrower can receive 30-40% off when using All Star Title!" and that "All Star is [Hypotec's] preferred Title Company." These representations are false, they claim, because:

> (i) neither UVS/Hypotec nor its loan funding affiliates recognize the designation of a "preferred" title company; (ii) a borrower cannot save any percentage of title fees with All Star, but instead is charged higher and supracompetitive fees under

the Kickback and Cartel Agreements; (iii) the reason the UVS/Hypotec broker wants a borrower to use All Star is for Hypotec to obtain kickbacks and to perform its obligations under the Cartel Agreements and the pattern of racketeering activity All Star and UVS/Hypotec and Abitbol conduct in furtherance of the All Star Scheme, not because the borrower will receive lower fees; and (iv) any borrower responding to the direct mail solicitation does not "choose" All Star, but will be assigned and referred by UVS/Hypotec to All Star.

[*Id.* ¶ 140]. Plaintiffs believe Hypotec issued these false representations, which were made in furtherance of Hypotec's unlawful acts and without any intent to offer discounts, in its telemarketing and live calls with borrowers. [*Id.* at ¶¶ 141-143].

3. Hypotec's and All Star's False Allocation of Fees and APR Manipulation

Plaintiffs also accuses Hypotec of fraudulently concealing its wrongdoings by manipulating and  falsely minimizing the Annual Percentage Rate ("APR") associated with their loans. The APR is "intended as a tool for borrowers to compare closing and settlement costs across loans with similar interest rates and to easily identify when one loan has substantially higher fees than another loan at the same interest rate." [*Id.* ¶ 144].

 Plaintiffs specifically allege that Hypotec and All Star falsely minimized the APR by allocating the charges for title and settlement services associated with borrowers' loans only to those categories not included in the APR. [*Id.* ¶ 146]. For example, All Star allocated all charges for title and settlement services to the category of "Title Exam" or "Abstract"—categories excluded from the APR—instead of including them in the APR calculation. [*Id.* ¶ 147-148]. Hypotec was aware of, participated in, and ratified this practice. [*Id.* ¶ 149-50]. As a consequence, Hypotec misrepresented to the costs of loans to borrowers and concealed the discovery of their wrongdoings. [*Id.* ¶ 151-154].

4. <u>False Representations in Borrowers' Loan Documents</u>

Plaintiffs' final allegation is that Hypotec and All Star made false representations on borrower's loan documents.

Hypotec was required to provide a "good faith" estimate, which included only the charges for "title services and lender's title insurance," to its borrowers within three days of a loan application. [*Id.* ¶ 156-157]. However, Hypotec falsely included charges that were not title services or lender's title insurance, including the various overcharges and surcharges to which its borrowers were subject. [*Id.* ¶ 158]. They specifically concealed from borrowers:

> (i) the charges and amounts associated with the surcharges and flat fixed fees, (ii) the fixed and supracompetitive nature of the charges, (iii) the illegal kickbacks, and (iv) the coordinated business relationship between Abitbol, Hypotec and All Star under the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and UVS/Hypotec and Abitbol conduct[ed] in furtherance of the All Star Scheme.

[*Id.* ¶ 159].

Hypotec was also required to provide to the settlement agent, who then produces to borrowers a HUD-1 Settlement Statement, all charges to the borrowers associated with the services provided. [*Id.* ¶ 160-61]. However, Hypotec and All Star caused the false allocation of fees, as discussed above, to appear on the borrowers' HUD-1 statements, and omitted information about the kickbacks and various surcharges and overcharges. [*Id.* ¶ 162-64]. Hypotec also omitted reporting the fact that it receives a portion of these charges, instead misrepresenting that All Star retained all amounts paid when it actually kickbacks a portion to Hypotec. [*Id.* ¶ 165].

5. Plaintiffs' Reasonable Diligence

Finally, Plaintiffs, who had no knowledge of the ongoing malfeasances, exercised reasonable diligence before, during, and following the closing of their loans, as will be discussed further herein as appropriate. [*See id.* ¶¶ 168-201]. Despite her attempts at due diligence, Plaintiff Obiefuna did not discover, nor could she have discovered, her injuries until December 28, 2018. Only with reasonable diligence was Plaintiff Joseph able to discover her injuries on March 21, 2019. [*Id.* ¶ 205].

## Analysis

### I. Standard of Review

To survive a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must state a claim to relief that is plausible on its face." *Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 397 (7th Cir. 2018). At minimum, a plaintiff is required to support its complaint with some specific facts. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In determining the sufficiency of a claim under this standard, the court considers all allegations in the nonmovant's pleading to be true and draws such reasonable inferences as required in the nonmovant's favor. *Jacobs v. City of Chi.*, 215 F.3d 758, 765 (7th Cir. 2000).

### II. Discussion

1. Plaintiffs Have Insufficiently Pled an Exception to the RESPA Statute of Limitations

Plaintiffs charge Hypotec with violating the anti-kickback provision of RESPA, which provides: "No person shall give and no personal shall accept any fee, kickback, or

thing of value pursuant to any agreement or understanding, that business incident to or a part of a real estate settlement service involving a federal related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a).

We begin by determining whether Plaintiffs' RESPA claims are time-barred based on the applicable statute of limitations.

A private plaintiff must bring a claim for a violation of section 2607(a) within one year of the occurrence of the alleged RESPA violation. 12 U.S.C. § 2614. The parties appear to agree the REPSA claims are generally not subject to the discovery rule,[2] and thus Plaintiffs' RESPA claims would have accrued as of the date they closed their loans. For Ms. Obiefuna, that date was in October 2015, nearly three and half years prior to the filing of the March 15, 2019. Complaint. For Ms. Joseph, the date was in March 2012, seven years before this lawsuit was initiated.

Pursuant to this timeline, Hypotec argues that Complaint itself establishes that the RESPA claims are time-barred. While plaintiffs are generally not required to include facts in their complaint to overcome affirmative defenses such as a statute of limitations defense, the complaint may be dismissed when, as here, it becomes clear from the face of the Complaint that a claim is time-barred. *Cancer Found., Inc. v. Cerberus Capital Mgmt*., LP, 559 F.3d 671, 675 (7th Cir. 2009); *Baker v. Wells Fargo Bank*, N.A., 2012 WL 1886444, at *3 (N.D. Ill. May 23, 2012) (finding that plaintiff pled himself out of

---

[2] The discovery rule "starts the limitations period when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for his claim" *Chicago Bldg. Design, P.C. v. Mongolian House, Inc*., 770 F.3d 610, 614 (7th Cir. 2014).

court when he brought suit more than one year after alleged RESPA violation). In an apparent attempt to plead around the tardiness issue respecting their claims, Plaintiffs Obiefuna and Joseph have included a claim alleging that Hypotec fraudulently concealed its RESPA violations, thereby allowing the statute of limitations to be equitably tolled.

Hypotec argues that the allegations of fraudulent concealment do not suffice to toll the statute of limitations under these circumstances. According to Hypotec, "fraudulent concealment only tolls limitations where the acts constituting the concealment are something other than the alleged RESPA violation itself." [Dkt. 25, at 12 (*quoting Cada v. Baxter Healthcare Corp*., 920 F.2d 446, 451 (7th Cir. 1990) ("Fraudulent concealment denotes efforts by the defendant—above and beyond the wrongdoing upon which the plaintiff's claim is founded—to prevent the plaintiff from suing in time.")]. Here, says Hypotec, Plaintiffs' fraudulent concealment argument is based on the very acts that they contend constitute the RESPA violations—that is, the laundering of kickbacks through third party marketing companies—which cannot serve as the basis for tolling the statute of limitations.

Plaintiffs rejoin that Hypotec's argument, though not necessarily a complete misstatement of the law, is an incomplete and thus inaccurate representation of the doctrine of fraudulent concealment. Plaintiffs argue that fraudulent concealment may take two forms in the statute of limitations context: first, "acts that are self-concealing"; second, acts in which, "absent a subsequent act of concealment," the plaintiff would be aware of the cause of action. *Martin v. Consultants & Adm'rs*, 966 F.2d 1078, 1094 (7th Cir. 1992). In the former, the question of whether to allow for tolling hinges on the

Plaintiffs' due diligence, whereas the latter hinges on some subsequent act of the defendant. According to Plaintiffs, Hypotec's arguments reflect the second type of "fraudulent concealment," which Plaintiffs maintain they have adequately alleged.

Neither party, regrettably, presents a correct analysis of this issue.

Though Plaintiffs' assertions of law might be persuasive if properly applied, they have offered no attempt at an application. Namely, Plaintiffs criticize Hypotec for failing to recognize that the statute of limitations may be tolled where certain acts "are self-concealing," meaning that an initial act of fraud may be concealed by an act taken during the course of, rather than subsequent to, that fraud. *Wolin v. Smith Barney Inc*., 83 F.3d 847, 852 (7th Cir. 1996), *disapproved on other grounds by Klehr v. A.O. Smith Corp*., 521 U.S. 179 (1997). However, Plaintiffs offer *no* explanation as to how this principle applies here. Instead of applying what they regard as a relevant legal rule, Plaintiffs jump into an explanation of what they characterize as sufficiently pled acts "above and beyond the wrongdoing upon which their claim is founded." Stated otherwise, Plaintiffs criticize the legal rule advanced by Hypotec but then attempt to apply it, while disregarding entirely the alternative legal theory they claim actually does govern. We are left without the benefit of effective advocacy in trying to understand the way in which the "self-concealing doctrine" could or does apply in these circumstances.[3]

---

[3] For example, Plaintiffs claim that Hypotec "concealed kickbacks by laundering them through marketing companies," but how this conduct supports a finding, as required by the self-concealing acts doctrine, that 1) a substantive fraud occurred and 2) Hypotec engaged in a "misleading, deceptive, or otherwise contrived actions or scheme" in the course of committing that fraud is completely unaddressed by Plaintiffs. *See Martin*, 966 F. 2d at 1094.

Of equal concern is the fact that both parties have referenced the terms "equitable tolling" and "fraudulent concealment" as if they denote identical legal principles, when, in fact, they do not. For example, while Hypotec's statement with respect to fraudulent concealment is generally accurate, it ignores the companion doctrine of "equitable tolling." Hypotec refers to "equitable tolling" as if that doctrine is somehow interwoven with Plaintiffs' claims of fraudulent concealment. Plaintiffs, on the other hand, despite asserting "equitable tolling" because of the "fraudulent concealment," fail to recognize that the doctrine of equitable tolling exists separately from, as is not contingent upon, fraudulent concealment. We will attempt, therefore, to illuminate the relevant distinctions between "equitable tolling" and "fraudulent concealment" in this context in an effort to advance a resolution of the issues pending before us.

It is true that equitable tolling is frequently confused with fraudulent concealment, but the Seventh Circuit has made clear the fact that these are two separate doctrines. *Asher v. Chase Bank United States, N.A.*, 310 Fed. Appx. 912, 917 (7th Cir. 2009); *Shropshear v. Corp. Counsel of Chi.,* 275 F.3d 593, 595 (7th Cir. 2001); *Olszewski v. Quicken Loans Inc.,* 2013 WL 317060, at *2 (N.D. Ill. Jan. 28, 2013). To succeed on a claim of equitable tolling, a plaintiff must show "that he could not by exercise of reasonable diligence have discovered essential information bearing on this claim." *Shropshear*, 275 F. 3d at 595. Equitable tolling allows for an extension of time within which a party is allowed to bring suit "even if the defendant is not responsible for the

plaintiff's failure to sue within the limitations period[.]" *Id.*[4]  This doctrine does not require fault on the part of the defendant, but "it is applied sparingly and only where extraordinary circumstances beyond the litigant's control prevented timely filing." *Olszewski*, 2013 WL 317060 at *2 (*citing Asher*, 310 Fed. Appx. at 917).

Plaintiffs' Complaint does detail their "reasonable diligence" allegations with regard to their efforts to uncover Hypotec's wrongdoing, but they stop short of offering any analysis or discussion of the other element of the equitable tolling doctrine, namely, whether "extraordinary circumstances" existed that would permit the equitable tolling of the statute of limitations.  Indeed, Plaintiffs' Complaint and briefing is wholly ambiguous as to whether it is pursuing relief based on an equitably tolling theory. Accordingly, while equitable tolling *may* apply here, we are unable to determine with certainty, based on the information before us, whether it *does* apply.

In contrast to the doctrine of equitable tolling, the doctrine of equitable estoppel applies if the defendant takes active steps to prevent the plaintiff from suing in time. *Asher*, 310 Fed. Appx. at 917; *Shropshear*, 275 F.3d at 595. This doctrine is often referred to as "fraudulent concealment," though fraudulent concealment is technically one aspect or example of the broader doctrine of equitable estoppel. *Id.* In this context, as Hypotec has explained, equitable estoppel "denotes efforts by the defendant, above and

---

[4] Even though the discovery rule may not apply to RESPA claims, other district courts in our circuit have held that equitable tolling can apply to RESPA claims where the plaintiffs establishes the requisite elements. *Baker v. Wells Fargo Bank, N.A.*, 2012 WL 1886444, at *3 (N.D. Ill. May 23, 2012); *Thomas v. Ocwen Fed. Bank FSB*, 2002 WL 99737, at *3 (N.D. Ill. Jan. 25, 2002).

beyond the wrongdoing upon which the plaintiff's claim is founded, to prevent, by fraud or deception, the plaintiff from suing in time."

Hypotec is correct, therefore, in arguing that Plaintiffs' claims of fraudulent concealment cannot simply be the same factual allegations on which their RESPA claims are based. *See Arriaga v. Wells Fargo Bank, N.A.,* 2011 WL 4738522, at *3 (N.D. Ill. Sept. 30, 2011). Hypotec's own analysis does not address how equitable tolling might apply here, nor how the doctrine of "self-concealing acts" might apply, but Hypotec's failures are not what's important here because it is Plaintiffs who bear the burden of establishing that an exception to the statute of limitations applies. *Asher*, 310 Fed. App'x at 917.

We need to address as well whether Plaintiffs' have sufficiently pled acts of fraudulent concealment—above and beyond those allegations underlying the alleged RESPA violations—that might allow for a tolling of the imitations period on that basis. Here, the parties' focus on Plaintiffs' claim that Hypotec concealed its unlawful kickbacks through the "false allocation of fees" and corresponding manipulations of the APR, as well as the alleged misrepresentations in the loan borrowing documents.[5]

_____

[5] Plaintiffs summarily argue that "Defendants continued resort to claims of 'co-marketing' are an additional, and continuing, act of concealment[.]" However, Plaintiffs offer little or no explanation of this legal theory. We also note that an argument might exist that the "sham invoices and payment records" associated with the alleged kickbacks potentially served as conduct "above and beyond" the actual RESPA violations. However, Plaintiffs have not raised this argument, and the Court will not conduct Plaintiffs' legal research nor construct its arguments for it.

With respect to these allegations, Hypotec argues that the Complaint charges All Star, not Hypotec, with falsely allocating fees in order to manipulate the APR. Hypotec further argues that neither this false allocation of fees nor the misrepresentations in the loan borrowing documents would serve as a basis to allege concealment of the alleged kickbacks because these accusations plainly do not relate to the alleged RESPA violations. Hypotec also contends that the Complaint lacks any allegations claiming that Plaintiffs were recipients of the purportedly altered estimates or that Hypotec otherwise concealed the true cost of title and settlement services from Plaintiffs.

Plaintiffs generally have not responded to Hypotec's attacks on these deficiencies in their Complaint. They specifically do not address whether it is legally problematic that the Complaint omits any facts relating to Plaintiffs' receipts of false APRs which could have concealed the fraud. Additionally, Hypotec maintains that Plaintiffs rely on conclusive assertions that these misrepresentations served to fraudulently conceal the RESPA violations, but without explaining *how* this is so.[6] Without more, we share in

_____

[6] Plaintiffs cite a case from the District of New Jersey which held that "alleged misrepresentations on the [plaintiff's] HUD-1 form are not the predicate for the RESPA claim and may properly serve as the basis for the Plaintiff's fraudulent concealment claim." *Marple v. Countrywide Fin. Corp.*, 2008 WL 9418768, at *5 (D.N.J. May 7, 2008). There, the plaintiff had brought an action pursuant to RESPA's prohibition against fee-splitting. Plaintiff alleged that the defendant-lender has listed various settlement costs which it charged to plaintiff. Plaintiff then claimed that these services were not actually performed by the lender, but rather a third-party closing services company. According to plaintiff, the services company charged the lender less than what had been disclosed on the HUD-1 form, but the lender had marked up the charges for these services, pocketing the difference in violation of RESPA. The court concluded that defendant's alleged misrepresentation of costs on the HUD-1 form served to conceal the underlying unlawful fee-splitting. Plaintiffs have made no attempt to analogize these facts to its own claims, and it is not clear how the *Maple* court's conclusion applies here, that is, how the alleged misrepresentation of costs relating to title and settlement services on the HUD-1 form somehow concealed the alleged "Kickback Agreement" between All Star and Hypotec.

Hypotec's frustration with Plaintiffs' incantation of "fraudulent concealment." Plaintiffs simply have not offered any explanation as to whether they were affected by this alleged fraudulent concealment and, if so, how this fraudulent concealment concealed the allegedly unlawful kickbacks. These are gaps in the Plaintiffs' pleadings/briefings that cannot be filled by conjecture or wishful thinking.

We need not address at this time Hypotec's remaining arguments in support of dismissal of the RESPA claims against it. The Complaint establishes on its face that the RESPA claims are time-barred, and Plaintiffs have fallen short in their efforts to satisfy their burdens of showing how one or more exceptions to the statute of limitations applies.

## III.     Plaintiffs Fail to Plead a Valid Claim Pursuant to the Sherman Act[7]

Plaintiffs have based certain claims in the lawsuit on Section 1 of the Sherman Act, 15 U.S.C. § 1, which provides in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." To prevail in a suit alleging a violation of section 1 of the Sherman Act, the plaintiff must prove three elements: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable

_____

[7] Hypotec also requests dismissal of Plaintiff Joseph's Sherman Act and RICO claims on statute of limitations grounds. However, these causes of action, unlike the RESPA claim, are subject to the discovery rule. *In re Copper Antitrust Litig.,* 436 F.3d 782, 789 (7th Cir. 2006); *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1465 (7th Cir. 1992), as amended on reh'g in part (Oct. 26, 1992). Nothing on the face of the Complaint gives rise to a successful statute of limitations defense with respect to these claims. Rather, Plaintiff Joseph states that she did not discover, nor could she discover through reasonable diligence, the existence of these injuries until March 2019. She then details how she was "reasonably diligent." While Hypotec questions whether this was factually true, we leave this question of fact for resolution at a later state of this litigation. *Hileman v. Maze*, 367 F.3d 694, 697 (7th Cir. 2004).

restraint of trade in [a] relevant market; and (3) an accompanying injury." *Deppe v. Nat'l Collegiate Athletic* Ass'n, 893 F.3d 498, 501, 2018 WL 3102636 (7th Cir. 2018).

Here, Plaintiffs have alleged that All Star and Hypotec violated section 1 of the Sherman Act through the execution of a horizontal price-fixing agreement.[8] Horizontal price-fixing exists when two or more direct competitors agree to fix prices or to divide markets. Such agreements are generally deemed *per se* unlawful. *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007); *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *United States v. Heffernan*, 43 F.3d 1144, 1146 (7th Cir. 1994).

Hypotec attacks the sufficiency of Plaintiffs' horizontal price-fixing claim on two grounds: Plaintiffs have not alleged price fixing between two or more competitors as required to establish a horizontal price-fixing agreement, and Plaintiffs have insufficiently pled that an "agreement" existed between Hypotec and All Star.

A resolution of this issue rises or falls based on Plaintiffs' success (or not) in pleading an alleged horizontal price-fixing agreement existed between two competitors. We concur with Hypotec that horizontal-price fixing exists only when there is a conspiracy between or among two or more competitors. *See Leegin*, 551 U.S. at 886;

---

[8] Hypotec also sought to dismiss Plaintiffs' Sherman Act claims on the grounds that they had insufficiently pled facts alleging vertical price fixing. In response, Plaintiffs clarified that they were alleging only horizontal, not vertical, price-fixing. Later in their briefing, Plaintiffs request, in the event the Court determines that Plaintiffs have failed to sufficiently state a claim for horizontal price-fixing, that we refrain from determining the "nature of the agreements" on the grounds that genuine issues of material fact exist with respect to whether vertical or horizontal price-fixing exists. While this statement may be true in other settings, it is completely inapplicable here where Plaintiffs have unequivocally stated that they only intend to assert a horizontal price-fixing claim.

*Texaco Inc.* 547 U.S. at 5 (2006); *Brillhart v. Mut. Med. Ins., Inc.*, 768 F.2d 196, 199 (7th Cir. 1985) ("The plaintiff cannot make out a cause of action for horizontal price-fixing since the alleged agreement between Blue Shield and participating doctors does not run between competitors in the medical services industry or between competitors in the insurance industry."). *See also Butler v. Jimmy John's Franchise,* LLC, 331 F. Supp. 3d 786, 792 (S.D. Ill. 2018); *Int'l Outsourcing Servs., LLC v. Blistex, Inc.*, 420 F. Supp. 2d 860, 864 (N.D. Ill. 2006); *Wallace v. Free Software Found., Inc.,* 2005 WL 3239208, at *2 (S.D. Ind. Nov. 28, 2005).

Here, Plaintiffs have not alleged that Hypotec and All Star were competitors. In fact, they appear to concede that the two entities do not compete with one another. [Dkt. 38, at 13: "Defendants' argument is premised on the notion that horizontal agreement can only exist between competitors. This is incorrect."; *id.* at 14: "It is true that horizontal agreements often involve direct competitors. But such horizontal agreements are not limited to direct competitors."] Instead, Plaintiffs assert simply that they have adequately pled the existence of a "contract, combination or conspiracy," between "two legally distinct entities dealing with consumers at the same level of the market structure." Plaintiffs believe this is sufficient to state a claim for horizontal price-fixing even without allegations of competition between the two entities. But that is not enough.

First, Plaintiffs have offered no legal support for their averment that horizontal price-fixing can exist among entities that are not in competition with one another. The

citations they do provide do not support such a finding.[9] It is well-established that horizontal price-fixing involves two or more competitors. Their plea to broaden this doctrine in furtherance of the policy goals of the Sherman Act is unavailing in light of the pervasive authorities defining unlawful horizontal price-fixing as between two competitors. Accordingly, Plaintiffs "cannot make out a cause of action for horizontal price-fixing since the alleged agreement . . . does not run between competitors[.]" *Brillhart*, 768 F.2d at 199.

Second, Plaintiffs have not pled sufficient facts to establish that All Star and Hypotec occupy the same level in the market hierarchy thereby plausibly implying a competitive relationship between the two entities. The lynchpin of their factual allegations is that Hypotec and All Star "interacted with borrowers on the same transaction, often at the same time, and for single, unified purpose of closing the loan."

---

[9] *Oksanen v. Page Memorial Hospital*, 945 F. 2d 696, 702 (4th Cir. 1991) did not address whether horizontal price-fixing can exist between two non-competitive entities. Rather, the *Oksanen* court's statement that plaintiffs must plead "evidence of a relationship between at least two legally distinct persons or entities" was issued in the context of evaluating whether the alleged conspirators were actually operating as a unified entity, rather than two distinct entities as required to prevail under the Sherman Act. This statement plainly was not offered in furtherance of an argument that horizontal price-fixing could exist between *any* two entities, regardless of competition. Additionally, we do not believe the Northern District of Indiana's statement in *Morrison v. Murray Biscuit Co.* that "to find any horizontal agreement the parties to the agreement must occupy the same level in the manufacturer/broker/broker-distributor hierarchy" was intended to imply that horizontal price-fixing could exist in non-competitive relationships. 617 F. Supp. 800, 807 (N.D. Ind. 1985) (dismissing horizontal price-fixing complaint on the grounds that "the parties did not occupy the same level in the hierarchy.") *aff'd*, 797 F.2d 1430 (7th Cir. 1986). The more plausible reading of this excerpt is that occupation of the same level in the relevant industry is reflective of competition. For example, our sister court has evaluated whether the alleged conspirators were operating as competing sellers by assessing the extent to which they were distributing products at the same level. *Danielson Food Products, Inc. v. Poly-Clip Sys.*, 120 F. Supp. 2d 1142, 1145 (N.D. Ill. 2000).

But these facts, assuming they are true, and we do, do not create an inference that All Star (a title and settlement services company) and Hypotec (a mortgage lender) were both offering the same services, operating in similar roles or at the same level, or otherwise in competition with one another in the market. *See Danielson*, 120 F. Supp. 2d at 1145 (*citing Products Liability Ins. Agency, Inc. v. Crum & Forster Ins. Companies*, 682 F.2d 660 (7th Cir.1982); *see also Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742, 744 (7th Cir. 1982). Additionally, the averment in the Complaint that title and settlement services companies maintain a horizontal relationship with mortgage lenders is not supported by any facts alleged or by citation to any legal authorities. Finally, we simply are unable to accept Plaintiffs' conclusory statement that Hypotec "stepped into the shoes of a title and settlement service provider," especially since this statement is advance without any explanation, or citation to specific allegations in the Complaint or to any controlling or authoritative legal authorities.[10]

We conclude by noting that this analysis is consistent with that laid out in the single, relevant federal district court decision uncovered by our research in which a mortgage lender was accused of horizontal price-fixing with a title services company. In *Somerville v. West Town Bank & Trust*, plaintiffs (represented by the same counsel as our plaintiffs in this matter) alleged that West Town, a commercial bank who had brokered mortgages to a class of borrowers, conspired to fix prices with the same title and

---

[10] Plaintiffs also aver, again without citation to any legal authority, that it is necessary for Hypotec to concede a horizontal relationship with All Star in order to maintain their defense of lawful co-marketing with respect to the alleged RESPA violations. Plaintiffs have offered no rationale for this conclusion that co-marketing only exists between horizontal competitors.

settlement services company at issue here: All Star. The District Court of Maryland rejected plaintiffs' claim that the two entities could by liable for horizontal price-fixing when they were not competitors. The court, consistent with our own analysis here, found:

> West Town and All Star are distinctly not competitors. West Town is a "commercial bank," whereas All Star is a "title and settlement services company," All Star does not offer residential mortgages, and West Town does not provide settlement services . . . Plaintiffs here concede that the two allegedly conspiring entities are not competitors. Notably, Plaintiffs have not supplied a single case that has applied the per se rule to non-competing entities allegedly engaged in a price fixing scheme. Because Plaintiffs did not, as they must, plausibly allege that West Town and All Star are competitors, they have not sufficiently pled a per se violation of the Sherman Act.

*Somerville v. W. Town Bank & Tr.*, 2019-2 Trade Cases P 81006. 2019 WL 6131288 (D. Md. Nov. 19, 2019). As in *Sommerville* and for the same reasons, Plaintiffs' Sherman Act claim must be dismissed.

## IV.     Plaintiffs' RICO Claims Survive the Motion to Dismiss

Plaintiffs also charge Hypotec with violating RICO, 18 U.S.C. § 1962 *et seq.* To state a civil RICO claim, Plaintiffs must allege: "(1) conduct (2) of an enterprise (3) through a pattern of racketeering activity." *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011). They must also allege an injury that was actually and proximately caused by the alleged RICO violations. Hypotec seeks dismissal of this cause of action, arguing that Plaintiffs "(1) fail to plead predicate acts of mail and wire fraud with particularity, (2) fail to show how their purported injuries were proximately caused by Hypotec's allegedly fraudulent behavior; and, (3) fail to establish that the run-of-the-mill commercial relationship between All Star and Hypotec was an 'enterprise' for purposes of RICO."

1. <u>Plaintiffs Sufficiently Plead Predicate Acts of Mail and Wire Fraud</u>

To establish a RICO violation, Plaintiffs must show that Hypotec engaged in a "predicate offense." Here, Plaintiffs have charged Hypotec with committing the predicate acts of wire and mail fraud over a period of at least five years, affecting more than 1200 of Hypotec's borrowers. For their Complaint to sufficiently plead this predicate offense, they must allege facts showing: (1) a scheme to defraud, (2), an intent to defraud; and (3) use of the mail or wires in furtherance of the scheme. *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006). Additionally, the allegations of mail and wire fraud must comport with Federal Rule of Civil Procedure 9(b), that is, they must be pled with particularity. This requires pleading, within reason, as to the "time, place, and content of the mail and wire communications" as well as identifying the parties to these communications. *Jepson, Inc. v. Makita Corp*., 34 F.3d 1321, 1327 (7th Cir. 1994). "Specificity requirements may be relaxed, of course, when the details are within the defendant's exclusive knowledge." *Id.* at 328.

Hypotec maintains that Plaintiffs have failed to plead the requisite "who," "when," and "where" of the alleged fraud. Specifically, Hypotec argues that Plaintiffs have only conclusively stated that the relevant mailings were sent to "borrowers," without alleging who these specific borrowers were or where they received the mailing. Additionally, Hypotec also notes that the Complaint fails to indicate that either Plaintiff received any mail or telephone solicitations.

Plaintiffs respond that have furnished all the details within their knowledge at this time. They insist that they have pled all the facts to which they have access including, to

wit: the parties issuing the communications, the purpose of those communication, the general timeframe in which these communications were occurred, and the manner in which the communications were delivered. Any specific details as to the complete demographic of people who received these solicitations is within Hypotec's exclusive knowledge; Plaintiffs explain that they simply do not have access to an exhaustive list of people target by Hypotec via telephone or mail. Plaintiffs also insist that it is not necessary to plead that they personally received any of the allegedly fraudulent communications in order to state their claims for wire or mail fraud. According to Plaintiffs, "the mail and wire fraud statutes criminalize the fraudulent acts undertake to secure illicit gains, not their ultimate success." [Dkt. 38, at 27 (*quoting United States v. Lupton*, 620 F. 3d 790, 805 (7th Cir. 2010)].

Hypotec omits any further discussion of this issue in its Reply brief. We thus presume it agrees: 1) that Plaintiff has supplied all of the information it has access to that is not otherwise within Hypotec's exclusive knowledge, thus warranting relaxed specificity rules and 2) that pleading receipt of the alleged fraudulent communications is not necessary to state a claim for wire or mail fraud. *Bonte v. U.S. Bank, N.A*., 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver," and "silence leaves us to conclude" a concession.). We take these averments to be uncontroverted.

Hypotec does also contend that Plaintiffs have failed to sufficiently allege that the solicitations contained any fraudulent communications. Hypotec maintains that the solicitations were simply transmitted in furtherance of a lawful co-marketing agreement

between Hypotec and All Star. However, to find for Hypotec on this issue, we would be required to determine as a matter of fact that the "scheme" as alleged by Plaintiffs was actually a lawful co-marketing between Hypotec and All Star. Clearly, we are not authorized to make such a finding, at least not at this juncture. Hypotec does not respond to Plaintiffs' argument that this question cannot be answered without fact discovery, nor does Hypotec respond to Plaintiffs' other proffered rebuttals on this issue.

2. Plaintiffs Sufficiently Plead Causation

Hypotec's arguments with respect to causation are woefully underdeveloped and patently conclusory, so much so that they are hardly worth addressing. Thus, we will respond in kind.

Hypotec argues that Plaintiffs' allegations of injury resulting from the alleged fraudulent behavior are "conclusory and formulaic." No explanation is offered as to how this is so. Accordingly, we find Hypotec's argument on this point also to be "conclusory and formulaic." Hypotec further avers that any alleged injuries were caused by All Star's fees, not any fraudulent action or other misrepresentation of Hypotec's.[11] Clearly, this argument does not address Hypotec's purported role in perpetuating the wire and mail fraud which served as the platform for Hypotec and All Star to commit their various alleged wrongs. No surprise, Plaintiffs rejoin with this precise argument in reverse, to

---

[11] Hypotec arguably could have asserted that the causation element has not been properly pled on the grounds that Plaintiffs could not have had any injury resulting from the alleged mail or wire fraud when the Complaint does not state that either of them received the allegedly fraudulent communications. However, Hypotec does not make this argument and we will not insert it into the discussion on its behalf.

which Hypotec offers *no* rebuttal or even acknowledgement in its Reply brief. Hypotec has provided no reasoned basis on which we could conclude that Plaintiffs' allegations of wire and mail fraud do not create a reasonable inference of plausible causation.[12]

### 3. Plaintiffs Sufficiently Plead the Existence of an Enterprise

For purposes of RICO, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The parties agree that the alleged "enterprise" here is not a legal entity; thus Plaintiffs must allege facts supporting the existence of an "association-in-fact" enterprise. Though "enterprise" is interpreted broadly, three factors must be pled in order for Plaintiffs' complaint to sufficiently assert the existence of an association-in-fact: "purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). In other words, an enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* Additionally, the Complaint must allege that the defendant was conducting the affairs of the enterprise rather than its own affairs.

---

[12] Hypotec states in its Reply brief that it is "forego[ing] a lengthy reply in favor of preserving resources for a potential resolution." While we respect the parties in their efforts to pursue an early settlement, this cannot serve as a justification for a failure to offer thoughtful arguments on the issues raised in its Motion to Dismiss. Nor is this an acceptable reason for the Court to insert itself into the crafting of its arguments on its behalf. Hypotec received multiple enlargements of time in which to file its Reply brief, allowing it an additional *six months* to fully and adequately brief its arguments. While we should never be heard to discourage settlement efforts, never!, we do believe it would have been advantageous at this stage of the proceedings for the parties to focus on the adequacies or inadequacies of the pleading and the legal sufficiency of the Plaintiffs' causes of action.

*United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co*., 719 F.3d 849, 854 (7th Cir. 2013).

Hypotec contends that Plaintiffs have not alleged the existence of an association-in-fact, but rather a run-of-the-mill business relationship. Indeed, Seventh Circuit case law distinguishes between these two situations: "a run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest, versus a truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest." *Bible v. United Student Aid Funds, Inc*., 799 F.3d 633, 655–56, 2015 WL 4911412 (7th Cir. 2015) (collecting cases). Mindful of this distinction, our goal here is to ascertain whether the Complaint alleges facts permitting the reasonable inference that, with respect to the alleged fraudulent activity, the individual entities were operating as a single entity. *Id.* For example, when the Seventh Circuit evaluated this distinction in *Bible*, it found the complaint sufficiently pled the existence of an association-in-fact on the grounds that it alleged an "unusual degree" of economic and functional interdependence among the entities comprising the association-in-fact.

Hypotec argues that Plaintiffs failure to allege that All Star and Hypotec operated interdependently in pursuit of the alleged fraud is fatal to their claim that an association-in-fact existed. As alleged by Hypotec, the "Amended Complaint merely pleads that Hypotec and All Star jointly marketed their respective services, each for its own respective benefit." [Dkt. 25, at 30]. Hypotec further argues that Plaintiffs have failed to state a "common purpose" which existed on behalf of the enterprise. Accordingly,

Hypotec claims that Plaintiffs have failed to sufficiently plead the existence of an association-in-fact.

Plaintiffs respond that they are not required to present any specific allegations with respect to the "interdependence" of the entities comprising the enterprise, stressing that the Supreme Court mandates a liberal interpretation of this concept sparing the parties a need to include any specific or heightened allegations beyond the three *Boyle* prerequisites. They further note that "RICO enterprise are not limited to 'business-like entities' and . . . they need not have a hierarchical structure or a 'chain of command.'" [Dkt. 38, at 31 (quoting *Rao v. BP Prods. N. Am., Inc.*, 589 F3d. 399 (7th Cir. 2009)). Plaintiffs maintain that they properly have alleged that Hypotec "participated in the operation or management" of the All Star Scheme enterprise and that they are not required to do more. They also defend the sufficiency of their allegation respecting the "purpose" of said enterprise.

We first address Hypotec's claim that Plaintiffs' have failed to allege that the entities were operating "interdependently." While the Seventh Circuit in *Bible* included an evaluation of the allegations of interdependence of the entities in holding that the complaint sufficiently alleged an association-in-fact, nothing in its decision indicated that it intended to require RICO victims always to plead with this level of specificity or with these particular factual allegations (though the information furnished in the *Bible* complaint is certainly helpful). *Bible*, 799 F.3d at 655. Indeed, the Seventh Circuit refrained from offering any opinion as to the level of detail required to plead the existence a RICO enterprise, concluding that the various allegations of interdependence

rendered that complaint indisputably sufficient. In fact, the Seventh Circuit, following the directive from the Supreme Court in *Boyle*, has refrained from placing heightened burdens on plaintiffs in pleading the existence of RICO enterprises. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 389 (7th Cir. 2010); *United Food*, 719 F.3d 849, 854 (Before *Boyle*, we would have had little trouble concluding that these allegations were insufficient to plead the existence of an association-in-fact . . . *Boyle*, however, took a liberal view of what it takes to be an association-in-fact for RICO purposes.").[13]

What Hypotec seeks in its motion to dismiss is a ruling from this court that would impose a more burdensome standard on Plaintiffs than that which is required by the Supreme Court and the Seventh Circuit, which have instructed lower courts to remain "liberal" when reviewing allegations of an enterprise and imputing to the term "enterprise" a broad meaning, consistent with the expansiveness of the very concept of an association-in-fact. *Boyle*, 556 U.S. at 944. Plaintiffs are required to plead only three elements: purpose, relationships, longevity. They have pled all three in the complaint under review. Only the factor of "purpose" remains in dispute.

Hypotec's invocation of the Seventh Circuit's *United Foods* decision may be persuasive in some other settings but here it is misplaced as buttressing authority for the

---

[13] We also note that Hypotec provides minimal explanation as to how the facts alleged indicate a "run-of-the-mill" business relationship as contemplated by *Bible* and its accompanying cases. While it is Plaintiffs' burden to sufficiently allege facts indicating something more than such a relationship, Hypotec cannot merely proclaim that the Complaint reflects a "run-of-the-mill" business relationship, accompanied with little more than boilerplate principles of law, and expect the Court to agree.

argument that no association in-fact-was established.[14] This appellate case evaluated whether the Complaint properly alleged that the alleged RICO violations were committed by the purported enterprise, rather than the individual entities—it simply did not address or conclude that the complaint failed to alleged an association-in-fact. *United Foods*, 719 F.3d at 854 ("Even if we were to assume, however, that the complaint sufficiently pleads the existence of an association-in-fact enterprise under *Boyle*, it does not adequately allege that Walgreens and Par were conducting the affairs of this 'Hrp enterprise,' as opposed to their own affairs.").

Hypotec's arguments hint at the related but distinct issue of whether, if an association-in-fact existed, the allegedly fraudulent activities were perpetuated by the association-in-fact rather than the individual actors therein. However, Hypotec never squarely addresses this issue, instead casting the problem entirely as Plaintiffs' failure to allege the existence of an enterprise. These issues may well overlap, but the analyses are neither identical nor interchangeable. *See Jay E. Hayden Found.*, 610 F.3d at 389 (discussing how even if an enterprise existed, the complaint must alleged the enterprise was used); *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009) (concluding that plaintiffs had failed to both adequately plead an association-in fact and adequately plead that the fraud was perpetuated by this alleged enterprise); *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1094 (N.D. Ill. 2016) (*comparing United*

---

[14] Hypotec, in its Reply brief, appears to recognize this issue to be distinct from the issue raised in its opening briefing. Nonetheless, one sentence in a Reply brief conclusively stating that "there is no evidence that [Hypotec] controlled the alleged association-in-fact" is a thin reed on which to hang an analysis of so complex an issue.

*Foods* and *Bible*). Hypotec, to its detriment, has not advanced any cogent argument addressing this topic. Again, we say, the Court will not conduct the legal research or construe omitted legal arguments on any party's behalf.

We turn now to address Hypotec's final argument on this issue–whether Plaintiffs have sufficiently alleged a "common purpose" of the alleged enterprise. Plaintiffs have pled multiples purposes, though we shall focus our review on the alleged purpose of obtaining unlawful kickbacks, given that Hypotec has asserted that this is the only purpose that it believes could arguably by have been furthered by the enterprise. Hypotec claims that, even so, this is an insufficient purpose to establish a RICO enterprise because these kickbacks were, in fact, nothing more than lawful co-marketing arrangements. As previously discussed, however, we shall not opine as to the legitimacy of the alleged kickbacks.

Accordingly, Defendants' arguments that Plaintiffs have failed to sufficiently plead their RICO claims are unpersuasive, for the reasons outlined above.

## CONCLUSION

Defendants' Motion to Dismiss [Dkt. 24] is **granted in part and denied in part.** Counts I and II are dismissed without prejudice, with leave to replead within 30 days consistent with the rulings laid out in this order. The Motion to Dismiss is denied with respect to Count III.

IT IS SO ORDERED.

Date:     3/31/2020

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Nicholas N. Bernard
JOSEPH GREENWALD & LAAKE, PA
nbernard@jgllaw.com

Steven C. Coffaro
KEATING MUETHING & KLEKAMP
scoffaro@kmklaw.com

Dina M. Cox
LEWIS WAGNER LLP
dcox@lewiswagner.com

Melissa L. English
SMITH GILDEA & SCHMIDT LLC
menglish@sgs-law.com

Janelle P. Kilies
LEWIS WAGNER LLP
jkilies@lewiswagner.com

Timothy F. Maloney
JOSEPH GREENWALD & LAAKE PA
tmaloney@jgllaw.com

Melissa S. Matthews
KEATING MUETHING & KLEKAMP PLL
mmatthews@kmklaw.com

Veronica B. Nannis
JOSEPH GREENWALD & LAAKE PA
vnannis@jgllaw.com

Michael Paul Smith
SMITH GILDEA & SCHMIDT, LLC
mpsmith@sgs-law.com

Gregory M. Utter
KEATING MUETHING & KLEKAMP, PLL
gmutter@kmklaw.com

Sarah A. Zadrozny
SMITH GILDEA & SCHMIDT, LLC
szadrozny@sgs-law.com